NO. 20-4023

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

RICHARD JENKS,                                )
                                              )
            Petitioner and Appellant,         )
                                              )
   v.                                         )
                                              )
UNITED STATES OF AMERICA,                     )
                                              )
            Defendant and Appellee.           )
_____       )

On Appeal From The United States District Court, District of Utah
Honorable Clark Waddoups, Presiding, Case No. 2:19-cv-00094-CW

APPELLANT'S COMBINED OPENING BRIEF AND APPLICATION
FOR CERTIFICATE OF APPEALABILITY
ORAL ARGUMENT REQUESTED

ANDREW PARNES
671 First Avenue North
P. O. Box 5988
Ketchum, Idaho 83340
Tel:  (208) 726-1010
Fax: (208) 726-1187
Email: aparnes@mindspring.com

ANNE MARIE TALIAFERRO
Brown, Bradshaw & Moffat
422 North 300 West
Salt Lake City, Utah 84101
Telephone: (801) 532-5297
Facsimile: (801) 532-5298
Email: ann@brownbradshaw.com

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    Facts from Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.    Facts Regarding Trial Counsels' Failure to Investigate . . . . . . . . . . . 5

     C.    Facts Regarding Trial Counsels' Failures During Plea Negotiations . 9

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     1.    A Certificate of Appealability Should Issue on Whether the District
          Court Erred in Finding there was No Prejudice from Trial Counsel's
          Failure to Investigate the DNA Evidence without Conducting an
          Evidentiary Hearing and Permitting Testing of the Evidence . . . . . 15

     2.    A Certificate of Appealability Should Issue on Whether the District
          Court Erred, Without Conducting an Evidentiary Hearing, in Finding
          Trial Counsels' Acts and Omissions During the Plea Negotiation
          Stages Did Not Constitute a Violation of the Sixth Amendment . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

ORAL ARGUMENT STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE RE PRIVACY REDACTION . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE RE DIGITAL SUBMISSION . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE RE PAPER COPIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ATTACHMENT 1 -    Decision Denying Expert Funds

ATTACHMENT 2 -    Decision Denying Motion to Vacate Convictions

ATTACHMENT 3 -    Decision Denying Certificate of Appealability

ATTACHMENT 4 -    *United States v. Polatis,* 2013 U.S. District LEXIS 39064
                   (unpublished opinion)

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Buck v. Davis,* 137 S.Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Byrd v. Workman,* 645 F.3d 1159 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . 14

*Harrington v. Richter,* 562 U.S. 86 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hill v. Lockhart,* 474 U.S. 52 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Jones v. Wood,* 114 F.3d 1002 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lafler v. Cooper,* 566 U.S. 156 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 27, 32

*Miller-El v. Cockrell,* 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Missouri v. Frye,* 566 U.S. 134 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*Riggs v. Fairman,* 399 F. 3d (CA9 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Slack v. McDaniel,* 529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sophanthavong v. Palmateer,* 378 F.3d 1391 (9th Cir. 2004). . . . . . . . . . . . . . . 29

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . 14, 16, 22

*United States v. Barrett,* 797 F.3d 1207 (10th Cir. 2015) . . . . . . . . . . . . . . . . . . 14

*United States v. Harms,* 371 F.3d 1208 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . 14

*United States v. Moya,* 676 F.3d 1211 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . 14

*United States v. Polatis,* 2013 U.S. District LEXIS 39064 . . . . . . . . . . . . . . 29, 30

*United States v. Rushin,* 642 F.3d 1299 (10th Cir. 2011) . . . . . . . . . . . . . . . 13, 14

*Williamson v. Ward,* 110 F.3d 1508 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 16, 21

## FEDERAL STATUTES

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13, 14

28 U.S.C. § 2255(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 31

## STATEMENT OF RELATED CASE

This case is related to *United States v. Jenks*, No. 16-4119.

Dated: May 5, 2020.

/s/ Andrew Parnes
Andrew Parnes
Attorney for Appellant

## STATEMENT OF JURISDICTION

The United States District Court, District of Utah had jurisdiction under 28

U.S.C. § 2255, entered judgment dismissing the motion on January 22, 2020, and

denied a certificate of appealability on February 27, 2020.  (Aplt.App. at 71, 96.)

A timely Notice of Appeal was filed.  (Aplt.App. at 93.)  This Court has

jurisdiction under 28 U.S.C. § 2253.

## ISSUES PRESENTED

1)    Whether trial counsel provided ineffective assistance by failing to
      investigate the critical DNA evidence before trial.  (Aplt.App. at 76-
      77.)

2)    Whether trial counsel provided ineffective assistance during the plea
      negotiation phase of the proceedings by failing to investigate the
      strength of the physical evidence, and thereafter, improperly advising
      Mr. Jenks to proceed to trial and to reject offers from the Government
      to settle the case.  (Aplt.App. at 81, 83-90.)

3)    Whether the district court erred in denying funds for the testing of
      physical evidence necessary to prove the prejudice prong under
      *Strickland v. Washington*, 466 U..S. 668 (1984).  (Aplt.App. at 62-
      70.)

4)    Whether the district court erred in denying relief without an

evidentiary hearing in order to permit Mr. Jenks the ability to obtain

testimony from trial counsel regarding the pre-trial investigation and

actions during the plea negotiation stage of the proceedings.

(Aplt.App. at 76, 83.)

## PROCEDURAL STATEMENT

After his direct appeal affirming his convictions was decided, Mr. Jenks

filed a § 2255 petition on February 11, 2019 challenging his conviction and

sentence. Respondent filed a response and thereafter Mr. Jenks filed his reply, a

request for expert funds, and a request for an evidentiary hearing.

The district court denied the request for funds and an evidentiary hearing.

On January 22, 2020, the district court dismissed the motion and denied the

request for a certificate of appealability on February 27, 2020.

## STATEMENT OF FACTS

A.    Facts from Trial

D.W., the victim in this case, was Richard Jenks' step-daughter. (Aplt.App.

at 155-56.) During the time in question, Mr. Jenks was employed as a Fish and

Wildlife law enforcement officer. (Aplt.App. at 161, 370.) He was also on the

Business Committee (the tribal council), the governing body of the Uintah and

Ouray Tribe. (Aplt.App. at 161, 327, 371-72.)  On the other hand, D.W. was in trouble frequently as a teenager, for everything from being disrespectful and dishonest to teachers, skipping classes, alcohol possession to retail theft. (Aplt.App. at 246, 253.) She was eventually placed in a juvenile facility for forty-eight days. (Aplt.App. at 246-48.)

In 2011, rumors circulated about Mr. Jenks, some involving sexual abuse of D.W. (Aplt.App. at 201, 294.) The sources of these rumors had connections to the tribal council and were thought to be politically motivated. (Aplt.App. at 358, 494-95.) D.W. and others were interviewed in connection with the rumors. (Aplt.App. at 445.) D.W. was in eighth grade at the time of her interview and she denied any kind of wrongdoing by Mr. Jenks. (Aplt.App. at 260-61.) The investigation was closed. (Aplt.App. at 450-51.)

Then, in October 2014, D.W. told her mother Mr. Jenks had been sexually abusing her since she was ten years old. (Aplt.App. at 223-24, 358.) D.W. and her mother reported the abuse to law enforcement authorities. (Aplt.App. at 361-62.) D.W. testified to many incidents of sexual abuse over a period of years. (Aplt.App. at 189, 207, 209-11.)  D.W. testified Mr. Jenks had a routine for abusing her which involved condoms. (Aplt.App. at 187.) After the abuse, he

3

would tie these items up in a bag and dispose of them in the woodpile, which was located behind their house. (Aplt.App. at 181, 188, 190-91.)

Shortly after this new report, officers searched the woodpile for evidence and located a bag containing condoms. (Aplt.App. at 381-84, 451-52.)  The following day, additional law enforcement officers returned to the woodpile to help photograph and collect more evidence. (Aplt.App. at 413, 425-27.)  They found additional condoms and collected DNA samples from D.W., her mother, and Mr. Jenks. (Aplt.App. at 456-57, 480-81.)

A forensic DNA examiner at the FBI lab examined the evidence. (Aplt.App. at 516.)  She examined five condoms, chosen at random from the nineteen condoms submitted to her. (Aplt.App. at 485, 558-59.) The most significant test results came from one condom. On this condom, a DNA sample taken from one side matched Mr. Jenks' DNA to a reasonable degree of scientific certainty. (Aplt.App. at 587-88.)  D.W.'s DNA matched the DNA profile taken from the other side of the condom to a reasonable degree of scientific certainty. (Aplt.App. at 588.)

During its case-in-chief, the defense called a DNA expert who merely confirmed the findings of the government's expert that this single condom contained DNA from both Mr. Jenks and D.W.  (Aplt.App. at 728.)

4

B.    Facts Regarding Trial Counsels' Failure to Investigate

The government provided a FBI DNA report dated February 10, 2015 to defense counsel.  The report informed trial counsel that the analyst examined only five of the 19 condoms collected in October, 2014.  The expert did not test one of the condoms because of its brittle condition, believing that no DNA evidence would be able to be collected from it.  Fourteen of the condoms remained unexamined by either the government or defense counsel at the time of trial.  The government expert did not test the other condoms because she had received positive results connecting both the alleged victim and Mr. Jenks to the condoms with various degrees of scientific certainty.  (Aplt. App. at 540, 559-60.)

Mr. Jenks' DNA was not found on one of the tested condoms, although his daughter's DNA was found on that condom.  (Aplt.App. at 570-71.)  On two other condoms, Jenks could not be excluded as being a minor contributor with his daughter being the major contributor.  (Aplt.App. at 572, 577-79, 582-84.)  On one of these condoms, the statistical significance upon which the government's expert could not exclude him as a contributor was extremely weak.  (Aplt.App. at 584.)  On the fourth condom, the government expert testified that to a "reasonable degree of scientific certainty" Mr. Jenks' DNA was located on one side of the condom and his daughter's was located on the other side.  (Aplt.App. at 587-88.)  The

5

expert testified that she denoted one side as the outside based on how the condom was sent to her and that she could not conclude which side was actually the inside or outside. (Aplt.App. at 566-67, 588-89.)

While it was possible to test for presence of blood or semen and to determine if the samples were from skin cells, saliva or other parts of the body, the expert testified that she did not conduct such testing, and found no semen on any of the four condoms tested.[1]  (Aplt.App. at 560.)

Prior to consultation with a DNA expert, trial counsel informed Mr. Jenks that the government's DNA evidence was weak, did not connect him to the offenses charged, and that they were "going to win the case."  As a result of that advice, counsel advised Mr. Jenks to reject three offers to settle the case, the last for a sentence less than one-third the mandatory minimum sentence if convicted. (Aplt. App. at 9-10.)

After defense counsel belatedly obtained the assistance of their own DNA expert, they only provided the expert with the results of the FBI reports and supporting documentation, and asked the expert only to review these materials. Defense counsel never asked the expert to conduct independent testing on any of

---

[1]The government expert did acknowledge that other private laboratories have the capacity to test for other sources of DNA other than blood or semen. (Aplt.App. at 595-96.)

the condoms. (Aplt.App. at 34-35.) As a result, the defense expert testified only about the statistical methods used in the FBI reports. (Aplt.App. at 720.) Trial counsel were not even aware that the expert had no ability to test these items or the hair samples for DNA until December 18, 2015 – a mere three weeks before trial when trial counsel sent an email to the expert. (Aplt.App. at 37.)

During a pre-trial hearing less than a month before trial, trial counsel informed the court that the results of the DNA tests were inconclusive because there was only a 1 in 2600 chance that the DNA belonged to Mr. Jenks. (Aplt.App. at 106.) However, both the FBI report as well as the defense expert concluded to a "reasonable scientific certainty" that Mr. Jenks' DNA was on one of the condoms and that he could not be excluded as the contributor of the DNA found on two other condoms. Only on one of the four condoms was the statistical evidence weak, a fact conceded by the government's expert as well.

Trial counsel obtained their expert report on December 8, 2015, about one month before trial. That expert's report noted that "some DNA associations were very strong and merits the verbiage of 'to a reasonable degree of scientific certainty', other statistics were weak." (Aplt.App. at 40.) Nevertheless, trial counsel called the expert to testify at trial in the defense case. The defense expert testified on direct that he agreed with all the results of the FBI report. (Aplt.App.

at 703.)  When asked by the government attorney on cross-examination whether he

agreed with the conclusions of the FBI analyst regarding the condom with both

Mr. Jenks' and his step-daughter's DNA, the expert stated that he fully agreed

with the report, thereby supporting the government's case.  (Aplt.App. at 720,

727-28.)

Even though the government failed to test all of the nineteen condoms

found at the scene, trial counsel did not seek to have the remaining samples tested.

In addition to failing to investigate the government's DNA evidence, trial

counsel also failed to engage an independent investigator to locate and interview

witnesses in the case.  Instead, counsel failed to interview the potential witnesses,

even though they obtained the names of others who had possibly engaged in

sexual relations with the alleged victim.  Not only did trial counsel fail to

interview them, trial counsel nevertheless provided the names to the government,

which then conducted further investigation of these potential witnesses.

(Aplt.App. at 102.)  While a number of these witnesses admitted to having sexual

intercourse with the alleged victim, none said they used a condom.  The alleged

victim was never questioned about her sexual encounters with these other people and thus there was no confirmation from her about the use of condoms.[2]

B.    Facts Regarding Trial Counsels' Failures During Plea Negotiations

Mr. Jenks was arrested in October, 2014, and released after posting bond in the tribal court.  In February, 2015, he was arrested on the federal charges and remained in custody during the federal court proceedings.

During the pendency of the federal proceedings, his attorneys informed him of several different plea offers they received from the prosecutor in his case.

In May, 2015, his attorneys told Mr. Jenks that the government offered a plea to a fifteen-year sentence.  At that time, his attorneys informed him that the DNA results they had reviewed showed a very low probability that the DNA found on the condoms was his and that it could have been from any member of his Ute tribe.  At that time, trial counsel had not retained a DNA expert to assist them. Based on their assessment of the DNA evidence and the purported weakness of the prosecution's case, defense counsel told Mr. Jenks the government made the offer because it did not have a good case.  As a result of the unsubstantiated advice from

---

[2]The government then obtained DNA samples from these witnesses and compared them to the results obtained from the four condoms.  (Aplt.App. at 42-43.)  However, neither the government nor defense counsel conducted any comparisons to the remaining 14 condoms.

counsel, Mr. Jenks rejected the offer and his attorneys continued to prepare for trial.

In June, 2015, his attorneys informed Mr. Jenks that the prosecution had bettered their offer to a ten-year deal. His attorneys did not discuss the specific charges or applicable sentencing guidelines at that time, but continued to claim that the government's case was weak, and based on this advice, Mr. Jenks rejected this offer.

In September, 2015, his attorneys informed Mr. Jenks that the prosecution made an eight-year offer to settle the case. A July 29, 2015, email between the government attorney and defense counsel evidences both the prior ten year offer and the possible eight year settlement. (Aplt.App. at 45.) At this time, trial counsel met with Petitioner and told him that "we are going to win this case." Counsel explained that based on the DNA evidence, the prosecution could not prove that the DNA on the condoms was his. A week later, both trial counsel met with Mr. Jenks again, one of them expressing that he "was confident we were going to win the case." He told Mr. Jenks that they were in the process of getting a DNA expert to analyze the FBI DNA report. As late as November, 2015, Mr. Jenks was continuing to request a report from the defense expert. (Aplt.App. at 47.)

Neither of Mr. Jenks' attorneys discussed with him the fact that should he be convicted of either of the first two counts against him, the court would be required to sentence him to a mandatory minimum term of thirty years. Had they not repeatedly assured him that they were going to win the case and had they discussed with him the potential mandatory minimum sentence, Mr. Jenks would have engaged in further plea negotiations and have accepted the prosecution's last offer.

Only after trial had commenced did his attorneys tell him that they had been mistaken in their conclusions about the DNA evidence and that the FBI evidence showed conclusively that the DNA was his. At trial, both the defense and government expert basically agreed about the DNA results in that Mr. Jenks was only excluded from one of the condoms. Counsel informed Mr. Jenks that their understanding of the DNA evidence had been erroneous, that the evidence against him was thus stronger, and it was likely he would be convicted. By that time, the plea offers had been withdrawn and his counsel did not seek to settle the case.

## SUMMARY OF ARGUMENT

In discovery, the government provided trial counsel with a DNA report that examined only five of the nineteen condoms taken as evidence from Mr. Jenks' property–fourteen condoms remained untested. Counsel did not have

11

these condoms tested despite the significance of this evidence, both to the defense at trial and to the effect of the evidence on plea negotiations. Counsels' failure to investigate was deficient performance under the Sixth Amendment guarantee of effective assistance of counsel.

Mr. Jenks was prejudiced by this deficient performance as the additional DNA evidence could have supported his trial defense that the DNA located on the tested condoms either belonged to other males, who had admitted having sex with the victim or that his DNA on was found on a single condom was transfer DNA that resulted from improper handling during the seizure of the items.

Conversely, if defense testing resulted in a finding that Mr. Jenks' DNA was on the fourteen remaining condoms, trial counsel would have known the full strength of the government's case prior to trial, and would have been in the position to advised Mr. Jenks of the probability that he would be found guilty at trial, and that a reasonable settlement offer should be accepted. This would have resulted in a significantly reduced sentence.

The district court denied Mr. Jenks' motion for funding during the 2255 proceedings to conduct the DNA testing; thus, he was unable to demonstrate whose DNA was on the fourteen condoms. The district court abused its discretion

in denying this motion, thereby preventing Mr. Jenks from conclusively demonstrating the prejudice from trial counsels' omissions.

As a result of their failure to investigate and their misunderstanding of the strength of the government's DNA evidence, counsel misadvised Mr. Jenks during the critical negotiation stage of the case. As a result of their failures, they advised Mr. Jenks the evidence was weak and he should reject offers to settle that case for a sentence of less than ten years, well below the mandatory minimum sentence of thirty years if convicted.

The district court erred in failing to grant an evidentiary hearing in this case as Mr. Jenks set forth sufficient evidence to demonstrate that he was denied the effective assistance during the plea negotiation stage whether or not a detailed plea offer was made by the government.

## STANDARDS OF REVIEW

As the claims were dismissed on the merits, in order to obtain a certificate of appealability, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). This threshold showing does not require proof the petitioner will ultimately prevail on the merits. *Buck v. Davis*, 137 S.Ct. 759, 773 (2017).

On appeal from the denial of a § 2255 motion, ordinarily "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011). "[W]here, as here, the district court does not hold an evidentiary hearing, but rather denies the motion as a matter of law upon an uncontested trial record, our review is strictly de novo." *Id.* We review claims of ineffective assistance of counsel according to the two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, a movant must show that counsel's performance was deficient, meaning it "fell below an objective standard of reasonableness as measured by prevailing professional norms." *Rushin*, 642 F.3d at 1302 (internal quotation marks omitted). This is a demanding standard, requiring a showing that the performance was "outside the wide range of professionally competent assistance." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotation marks omitted). The performance "must have been completely unreasonable, not merely wrong." *Id.* (internal quotation marks omitted). Next, a movant must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rushin*, 642 F.3d at 1302 (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial . . . ." *Byrd*, 645 F.3d at 1168 (internal quotation marks omitted). "Courts are free to address these two prongs in any order, and failure under either is dispositive." *Id.*

*United States v. Barrett*, 797 F.3d 1207, 1213-14 (10th Cir. 2015)

The decision to grant expert funds and to hold an evidentiary hearing are

reviewed for an abuse of discretion. *United States v. Moya*, 676 F.3d 1211, 1214

(10th Cir. 2012); *United States v. Harms*, 371 F.3d 1208, 1210 (10th Cir. 2004)).

An evidentiary hearing is required for a § 2255 motion "[u]nless the motion and

14

the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).

## ARGUMENT

**1.    A Certificate of Appealability Should Issue on Whether the District Court Erred in Finding there was No Prejudice from Trial Counsels' Failure to Investigate the DNA Evidence without Conducting an Evidentiary Hearing and Permitting Testing of the Evidence**

The district court concluded that there could be no prejudice from trial counsels' failure of investigation of the DNA evidence because the evidence admitted at trial was so strong that testing the other condoms was not reasonably probable to lead to a different result.  "[H]is argument would fail because no reasonable jury would have had any reasonable doubt respecting guilt because the evidence of his guilt was overwhelming."  (Aplt.App. at 78.)  "[T]he victim testified in specific detail at trial about Mr. Jenks' repeated sexual abuse of her which was corroborated by . . . DNA testing."  (Aplt.App. at 79.)

The district court also concluded that the decision not to test the remaining condoms was reasonable because it might be "harmful" to the defense.  (Aplt.App. at 82.)

The district court decision was erroneous for two distinct reasons. First, it misconstrued the potential impact from the testing of all the condoms.[3] And, second, the decision did not discuss the impact on plea negotiations of trial counsels' failure to investigate – had they done so, it would have resulted in a sentence for which Mr. Jenks would now be out of custody rather than serving a thirty year term.

Deficient performance is demonstrated in cases where the attorney fails to conduct an investigation into the issue at hand. *Id.* at 690-91. Under *Strickland*,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at pp. 690-691.

> The duty to investigate derives from counsel's basic function, which is "'o make the adversarial testing process work in the particular case.'" *Kimmelman*, 477 U.S. at 384 (quoting *Strickland*, 466 U.S. at 690). "Because that testing process generally will not function

---

[3]Of course, the parties and the court must only engage in speculation about the results of such testing because the court denied the motion for actual testing of the condoms.

> properly unless defense counsel has done some investigation into the
> prosecution's case and into various defense strategies, [the Supreme
> Court has] noted that 'counsel has a duty to make reasonable
> investigations or to make a reasonable decision that makes particular
> investigations unnecessary.'" Id. (quoting *Strickland*, 466 U.S. at
> 691).

*Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997).

Here, trial counsel knew the DNA evidence was critical to the defense of the case; however, as a direct consequence of their failure to investigate and understand the significance of the DNA evidence, they provided incorrect advice to Mr. Jenks. Although counsel did eventually engage a DNA expert to review the FBI reports, counsel failed to have any of the evidence independently tested.

The district court primarily focused on the prejudice prong, holding that the trial evidence against Mr. Jenks was "overwhelming." But this view of the evidence is based solely on speculation that testing the other evidence would have provided no favorable evidence. In essence, the district court was holding that because of the single condom containing both the victim's and Mr. Jenks' DNA, nothing else would have mattered to the jury. Such speculation is unwarranted.

First, consider the state of the case if the DNA of one of the other men with whom the victim had sex had been found on one of the condoms found in the same location. The district court found that merely because these other men denied

17

using a condom, there could be no physical evidence located on these condoms. But of course, this itself is mere speculation. The district court denied funds for testing during the 2255 proceedings, and therefore, Mr. Jenks could not provide any evidence that these men, as well as the victim, were lying about the nature of their sexual contact. Since these men provided DNA samples prior to trial, it would have been an easy process to compare that DNA to any found on the remaining fourteen condoms. Because of the danger of transfer DNA, it was important for the defense to determine whether the DNA of other men was on the other condoms.

Thus, the district court holding that because Mr. Jenks' DNA was found on one condom, there could be no significance from male DNA on other condoms collected by law enforcement from the same location was erroneous. The defense contended at trial that law enforcement did not properly collect the evidence from the scene; therefore, transfer of DNA from the numerous items from the Jenks household was a potential basis for finding Mr. Jenks' DNA on that one condom. Had the DNA of others who admitted having had sex with the victim been located on the other condoms, this would have provided additional evidence to support the transfer theory and demonstrated that both the victim and the others she had sex with were untruthful or mistaken, both about not using condoms and the locations

18

of where they engaged in sex. Instead, the district court accepted as true the allegations of these other men; testing of the condoms might well have demonstrated that at least some of them were mistaken and there is a reasonable probability the district court would have admitted the Rule 412 evidence at trial.

While the district court relied on the state of the evidence at the time the Rule 412 motion was heard, that is not the appropriate standard to apply. Rather, the district court should have reviewed the evidence after authorizing testing of the remaining fourteen condoms. Had the DNA of any of these other men been on these condoms, that physical evidence would have complied with the specific requirements of the rule; conversely, if the independent testing did not reveal any such evidence, Mr. Jenks would have been no worse off. But the crux of the issue is that no one will ever know the true state of the physical evidence because in the first instance, trial counsel failed to obtain the independent testing, and in the second instance, the district court denied the request to authorize the very testing that would resolve this matter once and for all. Instead, this Court is left to speculate about the results of the testing which could have exonerated Mr. Jenks.

The prejudice from the failure to test the other condoms, if none of the fourteen condoms contained Mr. Jenks' DNA, is that this evidence would have

significantly strengthened the defense argument that the investigative work was

sloppy and the DNA results from the one condom were likely the result

of improper evidence handling and potential transfers from materials in the burn

pile that clearly would have had his DNA.  The FBI expert admitted at trial that

she could not tell where the DNA on the condom belonging to Mr. Jenks came

from, as no sperm or semen was discovered.  This fact supported the defense

transfer theory that the DNA was not placed on the condom during sex.

Second, if no additional matches were found, Mr. Jenks would have

stronger evidence to support the defense theory that the victim was lying about the

extent of the abuse.  She testified that there was extensive sexual contact with Mr.

Jenks and each time he wore a condom.  The fact that fourteen condoms were

located in the same trash pile was strong corroboration for her testimony; yet, if

none of the other condoms matched Mr. Jenks, such findings would have

significantly undermined the complaining witness's credibilty, as well as her

description of the nature and extent of the abuse and undercut the results from the

one condom, so critical to the district court's reasoning.

In addition, the district court did not consider the impact during the plea

negotiation stage had proper defense investigation and testing uncovered

additional evidence that connected Mr. Jenks to the victim's allegation.  Instead,

the district court concluded the since the evidence might have been "harmful" to the defense, trial counsel acted reasonably in not testing the additional condoms. (Aplt.App. at 82.)  However, ignorance is not bliss in criminal cases, and the district court decision simply encourages defense counsel to ignore their fundamental duty to investigate the facts and the law, including the prosecution's evidence before advising the client as to plea offers.  And indeed, in no way is it ever objectively reasonable to falsely encourage clients to proceed to trial in the face of "overwhelming" evidence of guilt.  *See, e.g.*, ABA Stds for Crim. Justice, Pro. Function and Def. Function, Standard 4-6.1 (duty to explore dispositions short of trial only after appropriate investigation and study of case completed); *also*, *id*. at Standard 4-5.1 (only after informing himself or herself on the facts and the law should defense counsel advise the accused "with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome").  It is precisely because the evidence from the other condoms might have been "harmful" to the defense that counsel should have tested them, instead of telling their client false information about the strength of the Government's case during the pre-trial stage of the proceedings.

The facts here are distinguishable from *Harrington v. Richter,* 562 U.S. 86, 108 (2011) on which the district court relied.  (Aplt.App. at 82.)  There, the failure

21

to pursue particular expert assistance was considered only in the context of what was ultimately presented at trial, not how the investigation might have impacted settlement of the case, which was not before the court in *Harrington*.

> Even if it had been apparent that expert blood testimony could support Richter's defense, *it would be reasonable to conclude that a competent attorney might elect not to use it.* The Court of Appeals opinion for the en banc majority rests in large part on a hypothesis that reasonably could have been rejected. The hypothesis is that without jeopardizing Richter's defense, an expert could have testified that the blood in Johnson's doorway could not have come from Johnson and could have come from Klein, thus suggesting that Richter's version of the shooting was correct and Johnson's a fabrication. This theory overlooks the fact that concentrating on the blood pool carried its own serious risks. If serological analysis or other forensic evidence demonstrated that the blood came from Johnson alone, Richter's story would be exposed as an invention. An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense. *Strickland*, supra, at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. Here Richter's attorney had reason to question the truth of his client's account, given, for instance, Richter's initial denial of involvement and the subsequent production of Johnson's missing pistol.

*Id.* at 108 (emphasis added).

Here, in contrast, the issue is whether the results, even if harmful to an eventual trial defense, might have reasonably led to a different result in the pre-trial negotiation stage where so many cases are resolved and which has been deemed as "the critical point" for a criminal defendant. *E.g.*, *Missouri v. Frye*, 566 U.S. 134, 144 (2012)*; Lafler v. Cooper*, 566 U.S. 156, 169-70 (2012).

22

Mr. Jenks was facing a thirty-year mandatory sentence if convicted; the prosecutor was interested in settling the case without trial and made a number of proposed settlement offers.[4]  Had trial counsel fulfilled their duty to investigate, and thereafter, had the testing proven "harmful" to the defense case, trial counsel would not have provided incorrect advice and encouraged Mr. Jenks to proceed to trial on the assurance that the DNA evidence was weak.  As alleged in the motion, had trial counsel properly informed Mr. Jenks as to the accurate nature of the DNA evidence, he would have sought to settle the case before trial thereby avoiding the mandatory sentence which will incarcerate him at least until he is 81 years old, essentially a life sentence.

Therefore, in applying a de novo standard of review, this Court should find that it is reasonably debatable among jurists whether the district court erred in denying the claim that trial counsel should have investigated and conducted the testing of the additional condoms.

Furthermore, it is reasonably debatable that the district court erred in denying Mr. Jenks the funds to conduct the testing and to hold an evidentiary

---

[4]Whether or not these "offers" were firm enough to be considered binding under *Lafler v. Cooper*, 566 U.S. 156 (2012) is not relevant to the potential impact of further testing in this context.  It is reasonably probable that knowledge of the results from the other testing would have significantly impacted the advice trial counsel provided to Mr. Jenks about the state of the evidence.

hearing on the issue.  It is undisputed that trial counsel did not independently test the evidence.  Failure to provide the funds for the tests during this post-conviction proceeding denied Mr. Jenks the opportunity to conclusively demonstrate the prejudice from trial counsels' acts and omissions and resulted in the district court speculating about the possible results from the testing.  Without the actual results, the district court was left to guess that his prior decision to exclude the 412 evidence was correct; Mr. Jenks was prevented from presenting conclusive evidence that the victim was lying and the other men she had sex with were mistaken and that they might have been the source of some physical evidence.  In addition, the district court did not fully consider how the independent testing would have impacted the plea negotiations in this case.

Similarly, it is reasonably debatable among jurists that an evidentiary hearing should have been granted in this case.  The government conceded that a hearing might be necessary to resolve Mr. Jenks' allegations.  Without a hearing, the district court could not uncover the full evidence of trial counsels' actions during the plea stage.  Mr. Jenks alleged that trial counsel misinformed him about the strength of the government's case and consistently told him he would be acquitted.  Yet, the district court's own analysis of the evidence is in direct contrast and that the evidence of Mr. Jenks' guilt was "overwhelming."  This

24

contradiction, alone, requires that this Court reverse the decision and remand for

an evidentiary hearing on trial counsels' acts and omissions regarding the DNA

evidence and the advice provided to Mr. Jenks.

**2.    A Certificate of Appealability Should Issue on Whether the District Court Erred, Without Conducting an Evidentiary Hearing, in Finding Trial Counsels' Acts and Omissions During the Plea Negotiation Stages Did Not Constitute a Violation of the Sixth Amendment**

Mr. Jenks alleged that his trial counsel provided ineffective assistance of

counsel during the plea negotiation stage by failing to inform him of the strength

of the government's case and advising him to reject at least three government

offers to settle the case for a sentence significantly less than the minimum

mandatory sentence of thirty years.

The district court denied this claim without holding an evidentiary hearing

finding that Mr. Jenks had not provided sufficient evidence that the government

had made an "offer" to settle the case, reasoning that the terms of any offer were

not specific enough under *Lafler* and thus were "conclusory." (Aplt.App. at 84,

90.) The district court erred in concluding, without an evidentiary hearing, that

Mr. Jenks did not present "credible evidence that the Government did in fact offer

him a plea deal." (Aplt.App. at 84-85.)

A certificate of appealability should issue on this claim for two reasons: first, the district court erred in resolving the matter without holding an evidentiary hearing as Mr. Jenks provided sufficient evidence that the government made an offer; and two, the district court decision ignores the impact of trial counsels' erroneous advice about the strength of the government's case on Mr. Jenks' refusal to engage in further plea negotiations, even if the Government had not yet made a concrete, detailed formal plea offer.

Mr. Jenks alleged, not one, but three different offers by the Government to settle the case and presented the evidence to support this allegation. Mr. Jenks stated that his attorneys advised him about the general terms of settlement at three different points in the pre-trial negotiation stages of the case. Moreover, his allegations were supported by the email from the prosecutor that referred to two of these offers. In the email, the prosecutor stated that "I could probably obtain approval to *offer* something closer to 8 years. Let's discuss at your leisure." (Aplt.App. at 45. (emphasis added).) While the full specific terms of the agreement were not contained in that email, Mr. Jenks clearly had a discussion with his counsel, based upon it. And in that discussion, trial counsel misadvised him that the government's case was weak and that he should reject the "offer."

26

In response to the motion, the Government argued that it "never extended a plea offer," but that "the parties discussed the mere prospect of a possible plea offer." (Aplt.App. at 84.) This argument was contained not in a sworn declaration or answer, but in a response to the allegations in Mr. Jenks' motion. Thus, the district erred in accepting this argument as fact. An evidentiary hearing is thus warranted to resolve the extent of the plea discussions and if they arose to the level of an offer sufficient to fall within the language of *Lafler.*

Second, there is no absolute requirement that a formal plea offer be made during the negotiation stage for a defendant to prove ineffective assistance of counsel during the plea stage. The Sixth Amendment guarantees a defendant the effective assistance of counsel at every critical stage of the proceedings, which includes "the *negotiation* and consideration of plea offers." *Missouri v. Frye*, 566 U.S. 134, 138 (2102)(emphasis added), see also *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

> "To a large extent . . . horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system." Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992). See also Barkow, Separation of Powers and the Criminal Law, 58 Stan. L. Rev. 989, 1034 (2006) ("[Defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes. This often results

in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial" (footnote omitted)). In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.

*Missouri v. Frye*, 566 U.S. at 144.

Throughout the "horse trading" in Mr. Jenks' case, his trial counsel failed to provide the effective assistance required at this critical stage. Instead of carefully discussing the proposed settlements, his counsel continually misinformed him about the nature of the evidence against him – the very DNA evidence the Government, the district court and even trial counsel belatedly considered strong evidence of guilt.[5] Indeed, as argued above, had trial counsel conducted additional DNA testing and had it uncovered additional evidence against Mr. Jenks, it is even more likely that he would have accepted the plea offer of less than ten years.

Mr. Jenks has also established a sufficient basis to warrant an evidentiary hearing as trial counsel failed to discuss the relevant sentencing guidelines regarding the "offers" in this case and provided incorrect legal advice regarding the strength of the defense at trial. Trial counsel failed to inform his client of the

---

[5]Defense counsel told the jury in closing argument, "What is damaging there, of course, and I'll admit, condom Number 10 . . ." (Aplt.App. at 787.) This is the very condom that defense counsels' own expert testified was a scientifically significant match with Mr. Jenks and the complaining witness.

relevant sentencing guidelines which would result in a sentence less than one-third the length of the minimum mandatory sentence if convicted at trial.

Grossly erroneous advice about the consequences of accepting a plea offer combined with erroneous advice about the probable effects of going to trial constitutes ineffective assistance of counsel. *Sophanthavong v. Palmateer*, 378 F.3d 1391, 1394 (9th Cir. 2004). In determining prejudice from deficient performance in the plea bargaining stage, the court should consider such factors as the overall strength of the government's case, the disparity in the sentences before and after rejection of the offer, and how erroneous the advice of counsel was. *See, e.g.*, *Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997).

Because Mr. Jenks relied, in part, on another ruling by the district court, the court sought to distinguish the significance of that case. See, *United States v. Polatis*, 2013 U.S. Dist. LEXIS 39064; 2013 WL 1149842 (unpublished opinion); Aplt.App. at 86-88.). As the district court noted in a similar context, "[t]he court need not wade into the complexity of the uses of 'offer' or 'firm offer' or the applicable contract principles that govern plea offers at this time because the proffered testimony allays any concerns it would have about whether the plea offer would have taken effect had the Defendant accepted it." In *Polatis*, the precise

nature of the offer was fully developed at an evidentiary hearing, the very hearing the district court denied here.[6]

In essence, the only difference between the allegations which warranted an evidentiary hearing in *Polatis* and those in this case is that Mr. Jenks did not produce evidence at the pleading stage about the count or counts contained in the offer.  (Aplt.App. at 86.)  As in *Polatis*, Mr. Jenks was informed of the potential sentence that might be imposed.  From the nature of the charges here, the district court erred in not concluding that the counts with a minimum mandatory sentence of thirty years would be dismissed and the government was offering pleas to at least one of the other two counts.

Moreover, the email in *Polatis* itself was not a formal plea offer, as it contained almost identical language to the email here: "I would be willing to present this offer to our screening committee.  I need to let you know that the screening committee will have the final say on the deal - I do not have that authority."  (Aplt.App. at 87.)  Here, the prosecutor's email stated:  "I could

---

[6]At that hearing, the evidence showed that the "offer" contained in an email had not yet been "approved" by the Government.  Nevertheless, defense counsel's failure to fully discuss this offer with his client warranted relief and reinstatement of the proposed offer.

probably obtain approval to offer something closer to 8 years. Let's discuss at your leisure." (Aplt.App. at 45, 84.)

Given these facts, it is debatable among jurists whether trial counsel provided ineffective assistance during the plea negotiations whether or not a "formal plea offer" was made by the Government. The record demonstrates that trial counsel did relay several offers of settlement to Mr. Jenks and each time advised him to reject settlement and proceed to trial because the Government's case was weak. Based upon these allegations, the district court erred in rejecting this claim without holding an evidentiary hearing. For all of these reasons, Petitioner has demonstrated a prima facie case of ineffective assistance of counsel during the plea negotiation stage of the proceedings and he is therefore entitled to an evidentiary hearing on this ground. 28 U.S.C. § 2255(b).

The proper remedy for the denial of the right to the effective assistance of counsel during plea negotiations is to set aside the conviction and permit Mr. Jenks to accept the prior offer.

> The specific injury suffered by defendants who decline a plea offer as a result of ineffective assistance of counsel and then receive a greater sentence as a result of trial can come in at least one of two forms. In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. This is typically the case when the charges that would have been admitted as part of the plea bargain are the same as the charges the defendant was convicted of after trial. In this situation the court may conduct an evidentiary hearing to

determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea. If the showing is made, the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between.

In some situations it may be that resentencing alone will not be full redress for the constitutional injury. If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a mandatory sentence confines a judge's sentencing discretion after trial, a resentencing based on the conviction at trial may not suffice. See, *e.g.,Williams*, 571 F. 3d, at 1088; *Riggs* v. *Fairman*, 399 F. 3d 1179, 1181 (CA9 2005). In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal. Once this has occurred, the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed.

*Lafler v. Cooper*, 566 U.S. at 171.

Here, because this Court was required to impose a minimum mandatory sentence of thirty years after trial, the proper remedy is to require the Government to reinstate the prior offer terms and permit Mr. Jenks to enter his plea and be sentenced.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that this Court grant

a certificate of appealablility on the claims and issues set forth above.  It is

requested that thereafter, this Court grant relief and set aside the convictions and

sentence, or in the alternative, remand the matter for an evidentiary hearing.

## ORAL ARGUMENT STATEMENT

Given the complex factual record and the legal arguments surrounding the

denial of the evidentiary hearing, oral argument is requested to personally respond

to questions the Court may have.

Dated:  May 5, 2020.

/s/   Andrew Parnes
Andrew Parnes
Ann Marie Taliaferro
Attorneys for Petitioner-Appellant
Richard Jenks

CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c) and 10th Cir. R. 32(b), I certify that

the accompanying brief is double spaced, that a 14 point proportional font was

used, and there are 7,617 words in the brief.

Dated: May 5, 2020.

/s/Andrew Parnes____
Andrew Parnes
Attorney for Appellant

## CERTIFICATE OF PRIVACY REDACTION

I hereby certify that all required privacy redactions have been made to this document.

Dated: May 5, 2020.

/s/ Andrew Parnes
Andrew Parnes

CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that this document has been scanned today for viruses by the most recent version of AVG Antivirus Security.  According to the program, this document is free of viruses.

Dated: May 5, 2020.

/s/ Andrew Parnes
Andrew Parnes

CERTIFICATE RE PAPER COPIES

I hereby certify that any required paper copies will be exact copies of the

version submitted electronically.

Dated: May 5, 2020.

/s/ Andrew Parnes
Andrew Parnes

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system on May 5, 2020.

Ryan Tenney and Elizabethanne Stevens, Assistant United States Attorneys, who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants are not registered CM/ECF users.  I mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participant on May 5, 2020:

      Richard Jenks,  21300-081
      FCI Butner Medium II
      Federal Correctional Institution
      P.O. Box 1500
      Butner, NC  27509

      /s/Andrew Parnes
      Andrew Parnes

ATTACHMENT 1

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD JENKS, JR. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PAYMENT OF EXPERT TESTING** |
| Petitioner, | |
| v. | Case No. 2:19-cv-94 |
| UNITED STATES OF AMERICA, | Judge Clark Waddoups |
| Respondent. | |

Before the court is Mr. Jenks' Motion for Payment of Expert Testing, (ECF No. 10). As explained below, the court DENIES Mr. Jenks' Motion.

<u>Background</u>

On February 11, 2015, a grand jury returned a four count indictment, charging Mr. Jenks with two counts of aggravated sexual abuse of a child and two counts of sexual abuse of a minor. (2:15-cr-72, ECF No. 1.) Investigation into these charges began around October 7, 2014, when Mr. Jenks' wife had reported to the Fort Duchesne Police Department that her (then) 16-year-old daughter, (the Victim), had disclosed that her step father, Mr. Jenks, had been sexually molesting the Victim since she was 11 years old. Investigators subsequently spoke with the Victim, who told them that when Mr. Jenks sexually assaulted her, he would use a condom and then throw the condoms away in a large wood pile behind their residence.

1

On February 19, 2015, Mr. Jenks entered a plea of not guilty to the charges. (2:15-cr-72, ECF No. 3.) According to Mr. Jenks, "[t]he government first provided . . . discovery regarding [an] FBI DNA report" to his trial counsel "on or about February 26, 2015 . . . ." (ECF No. 1 at 4.) According to Mr. Jenks, "[t]he FBI report informed trial counsel that the analyst examined only five of the 19 condoms collected in October, 2014." (ECF No. 1 at 4.) Mr. Jenks alleges that one of those five condoms was not tested for DNA evidence because the FBI's expert believed "that no DNA evidence would be able to be collected from it." (*See* ECF No. 1 at 4.) Of the remaining four condoms that were "examined," Mr. Jenks alleges the following:

> Petitioner's DNA was not found on one of the tested condoms, although his [step-] daughter's DNA was found on that condom. On two other condoms, Petitioner could not be excluded as being a minor contributor with his daughter being the major contributor. On one of these condoms, the statistical significance on which the government's expert could not exclude Petitioner was extremely weak. On the fourth condom, the government expert testified that to a "reasonable degree of scientific certainty" Petitioner's DNA was located on one side of the condom and his [step-] daughter's was located on the other side.

(ECF No. 1 at 4–5.) According to Mr. Jenks, his trial counsel "never asked" "their own" "DNA expert" to conduct independent testing of any of the condoms." (ECF No. 1 at 6.)

On September 17, 2015, Mr. Jenks filed a Sealed Motion to Admit Evidence of Alleged Victim's Prior Sexual History pursuant to Rule 412 of the Federal Rules of Evidence. (2:15-cr-72, ECF No. 68.) On December 21, 2015, a hearing was held on Mr. Jenks' Motion—among other motions. (*See* 2:15-cr-72, ECF No. 99.) At this hearing, Mr. Jenks' trial counsel proffered evidence of the victim's alleged sexual activity with five other men. (*See* 2:15-cr-72, ECF No. 96 at 3.) The Government had interviewed these men about their sexual history with the victim. (*See* ECF No. 1 at 7 ("Instead, even though trial counsel obtained the names of others who had possibly engaged in sexual relations with the alleged victim, counsel failed to interview the

potential witnesses, but nevertheless provided the names to the government, *which then conducted further investigation of these potential witnesses*.") (emphasis added).)

On December 22, 2015, the court denied Mr. Jenks' Motion. The court found that "[t]hese interviews establish[ed] that only four of" the men "admitted to being actually sexually active" with the victim. (*See* 2:15-cr-72, ECF No. 96 at 3.) "Of these four, one of them stated that" he and the Victim "began having sex after the allegations in the indictment ended." (*See* 2:15-cr-72, ECF No. 96 at 3.) The other three individuals stated that they had had sexual intercourse with the Victim during the period of time alleged in the indictment, but "most of these instances of sexual conduct occurred at these individual's homes, making any evidence from these encounters unlikely to be found in the woodpile on Mr. Jenks' property." (*See* 2:15-cr-72, ECF No. 96 at 3.) Additionally, "all three men stated that they did not use condoms when they had sex with" the Victim. (*See* 2:15-cr-72, ECF No. 96 at 3.) For these reasons, the court found that the Victim's "activity with these individuals could not account for the physical evidence recovered from the woodpile . . . ." (*See* 2:15-cr-72, ECF No. 96 at 4.)

According to Mr. Jenks, "[t]he government then obtained DNA samples from" the men they had interviewed, "and compared them to the results obtained from the four condoms." (*See* ECF No. 1 at 7 n. 2.) On December 30, 2015, an FBI Laboratory Report was completed. (ECF No. 1-6 at 2.) This report appears to have concluded that the other men's DNA was not found on any of the four condoms the Government had previously tested. (*See* ECF No. 1-6 at 3 ("A . . . are excluded as potential contributors of the DNA obtained from items 3(1), 5(2), 7(1), 7(2), and 10(1).").)

A jury trial was held in January of 2016. (*See* 2:15-cr-72, ECF No. 116.) Mr. Jenks "was convicted on Counts 1, 3, and 4 of the Indictment. (ECF No. 1 at 2.) "Sentencing was held on June 17, 2016, and judgment was entered on June 24, 2016." (ECF No. 1 at 1.)

On February 11, 2019, Mr. Jenks filed a Motion to Vacate and Set Aside Conviction and Sentence Under 28 U.S.C. Section 2255. (ECF No. 1.) In this Motion, Mr. Jenks alleges that his trial counsel was ineffective for four reasons. Relevant here, he alleges that his trial counsel provided ineffective assistance by failing to properly investigate the DNA evidence in a timely manner and by failing to properly analyze the government's DNA results. (ECF No. 1 at 3–4.) More specifically, Mr. Jenks argues that his trial counsel's "failure to test the remaining 14 condoms was error in two aspects." (ECF No. 1 at 7.)

First, he argues that "at the hearing on the Federal Rules of Evidence, Rule 412 motion, trial counsel admitted that they had not tested the remaining fourteen condoms and thus could not argue that Petitioner's DNA was not on those condoms or that some other male's DNA along with that of the alleged victim was on those condoms." (ECF No. 1 at 8.) Alternatively, Mr. Jenks argues that "the testing of the other condoms might have uncovered additional evidence against [Mr. Jenks], which would have facilitated case settlement. But as a result of the [trial] counsel's failure to investigate the DNA evidence in the case, the [trial] attorneys had no basis on which to encourage [Mr. Jenks] to settle the case." (ECF No. 1 at 8.)

On April 3, 2019, the Government filed an Opposition to Mr. Jenks' Motion. (ECF No. 9.) The Government argued, in relevant part:

> Jenks's DNA was conclusively found on one condom and could not be excluded
> from two additional condoms. Testing any of the untested condoms could have
> resulted in additional DNA matches, which could have given rise to a superseding
> indictment with added counts. Or it could have resulted in no additional matches,
> which would not have negated the conclusive match to Jenks. Given the scientific
> certainty of the one DNA match, no reasonable jury would have been persuaded

by negative results on the untested condoms.

Jenks also argues that the condoms might have yielded DNA from other male suspects. Even so, such evidence would not have been admissible at trial. Rule 412(a) specifically prohibits evidence offered to prove that a victim engaged in other sexual behavior. The exception in Rule 412(b)(1)(A) would not have applied because DNA on other condoms could not disprove Jenks's DNA match. Besides, other male DNA on the untested condoms would not disprove Jenks's DNA match.

(ECF No. 9 at 6.)

In his Motion for Payment of Expert Testing, Mr. Jenks, through counsel, argues that "[g]ood cause exists" for the court to grant funds "for the payment of expert testing" because Mr. Jenks is "indigent and the testing is necessary to prove prejudice from his trial counsel's failure to test the evidence at trial."  (ECF No. 10 at 2.) In his conclusion, Mr. Jenks "requests that this Court grant an amount not to exceed $ 6950 for the retention of the Serological Research Institute to conduct an initial examination of the 14 items . . . ." (ECF No. 10 at 5.)

<u>Legal Standard</u>

<u>Rule 6</u>

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 1796–97, 138 L. Ed. 2d 97 (1997). Rule 6(a) of the Rules Governing § 2255 Proceedings provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil procedure . . . ." "In the context of a proceeding under 28 U.S.C. § 2254," the Tenth Circuit has "held that good cause is established where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *United States v. Moya-Breton*, 439 F. App'x 711, 715–16 (10th Cir. 2011) (internal quotation marks omitted) (citations

omitted). The Tenth Circuit, in an unpublished decision, has applied that standard to Section

2255 proceedings. *See id*. at 716. ("We see no reason to apply a different standard here.").

<u>Analysis</u>

In his Motion, Mr. Jenks moves the court to grant funds for the payment of expert testing.

Mr. Jenks is putting the cart before the horse. Before addressing whether Mr. Jenks is entitled to

funds for that testing, the court must first address the preliminary question of whether he is

entitled to that expert discovery at all.

As discussed above, under Rule 6(a), a "judge may, *for good cause*, authorize a party to

conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure . . . ." Rule

6(a) of the Rules Governing § 2255 Proceedings (emphasis added). Mr. Jenks does not

specifically address Rule 6(a)'s good cause requirement. On this basis alone, the court would

deny Mr. Jenks' request for funds for expert testing. The court nevertheless addresses whether,

based on the record available to this court, he has satisfied Rule 6(a)'s good cause requirement.

"Before addressing whether" Mr. Jenks "is entitled to discovery," the court must

"identify the 'essential elements'" of his claim. *Bracy*, 520 U.S. at 904; *see also Peel v. United*

*States*, No. 06-CR-30049-WDS, 2013 WL 120190, at *3 (S.D. Ill. Jan. 9, 2013). Mr. Jenks'

"claims are all premised on ineffective assistance of counsel, so he ultimately must establish both

that his [trial] counsels' representation fell below an objective standard of reasonableness and

that he was prejudiced as a result." *Peel*, 2013 WL 120190 at *3. "With respect to prejudice, a

challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Harrington v. Richter*, 562 U.S.

86, 104, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011) (bold added). Accordingly, to be entitled

to discovery related to DNA testing, Mr. Jenks must make "specific allegations that show reason
to believe that he may, if the facts are fully developed, be able to demonstrate that his counsels'
representation fell below an objective standard of reasonableness *and* that he was prejudiced as a
result." *Peel*, 2013 WL 120190 at *3. Mr. Jenks does not meet that standard.

Additional testing on the fourteen condoms could lead to a combination of up to at least
three possible outcomes, none of which would support a different outcome at trial.

First, additional testing could have resulted in DNA of other men being found on the
condoms. But this outcome would not have proven that Mr. Jenks did not commit the crime for
which he was convicted. The Victim testified in specific detail at trial about Mr. Jenks' repeated
sexual abuse of her which was corroborated by the DNA testing. The discovery of another man's
DNA on one of the fourteen condoms could not have changed the fact that Mr. Jenks' "DNA was
located on one side of [a] condom and his [step-] daughter's was located on the other side." (ECF
No. 1 at 5.) Even if this first possible outcome were fully developed, the court has no reason to
believe that the result of the trial would have been different. Mr. Jenks has therefore not provided
a reason to believe that he was prejudiced by his trial counsel's decision to not test the fourteen
additional condoms.

Second, additional testing could have resulted in no additional DNA matches. Again, this
could not have changed the fact that Mr. Jenks' "DNA was located on one side of [a] condom
and his [step-] daughter's was located on the other side." (ECF No. 1 at 5.) Even if this second
possible outcome were fully developed, the court has no reason to believe that the result of the
trial would have been different. Mr. Jenks has therefore not provided a reason to believe that he
was prejudiced by his trial counsel's decision to not test the fourteen additional condoms.

Third, additional testing could have resulted in further DNA matches connecting both Mr. Jenks and the Victim. Mr. Jenks argues that this outcome "would have facilitated case settlement." (ECF No. 1 at 8.) Mr. Jenks argues that "[i]f more condoms connected [him] with his [step-] daughter, a reasonably competent attorney would have properly advised [him] about the strength of the evidence against him and urged [him] to accept a beneficial settlement in the face of the stronger evidence." (ECF No. 1 at 8.) Here, Mr. Jenks' theory is that he was prejudiced by "[h]aving to stand trial, [and] not choosing to waive it . . . ." *Lafler v. Cooper*, 566 U.S. 156, 163–64, 132 S. Ct. 1376, 1385, 182 L. Ed. 2d 398 (2012). "In these circumstances a [petitioner] must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id*. at 164.  Even if this third possible outcome were fully developed (that additional testing provides further evidence of Mr. Jenks' guilt), the court has no reason to believe that Mr. Jenks would have pled guilty because the Government would have almost certainly withdrawn the (alleged) plea offer upon discovering further evidence of Mr. Jenks' guilt.

Based on the foregoing, Mr. Jenks has not demonstrated good cause under Rule 6(a) for discovery relating to DNA testing.

<u>Conclusion</u>

As discussed above, because Mr. Jenks has not demonstrated good cause for the expert

testing he requests, there is no need for this court to grant funds for that testing. Mr. Jenks'

Motion, (ECF No. 10) is DENIED.


Dated this 2nd day of July, 2019.


BY THE COURT:


CLARK WADDOUPS
United States District Judge

ATTACHMENT 2

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD JENKS, JR.<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO VACATE AND SET ASIDE CONVICTIONS AND SENTENCE**<br><br><br>Case No. 2:19-cv-94<br><br>Judge Clark Waddoups |

Before the court is Mr. Jenks' Motion to Vacate and Set Aside Convictions and Sentence Under 28 U.S.C. § 2255. (ECF No. 1). For the reasons stated below, the court DENIES Mr. Jenks' Motion.

<u>Background</u>

On February 11, 2015, a grand jury returned a four count indictment, charging Mr. Jenks with two counts of aggravated sexual abuse of a child and two counts of sexual abuse of a minor. (2:15-cr-72, ECF No. 1.) Investigation into these charges began around October 7, 2014, when Mr. Jenks' wife had reported to the Fort Duchesne Police Department that her (then) 16-year-old daughter, (the Victim), had disclosed that her step father, Mr. Jenks, had been sexually molesting the Victim since she was 11 years old. Investigators subsequently spoke with the Victim, who

1

told them that when Mr. Jenks sexually assaulted her, he would use a condom and then throw the
condoms away in a large wood pile behind their residence.

On February 19, 2015, Mr. Jenks entered a plea of not guilty to the charges. (2:15-cr-72,
ECF No. 3.) At this hearing, the court explained Mr. Jenks' rights and penalties for the charges.
(*See* 2:15-cr-72, ECF No. 3.)

According to Mr. Jenks, "[t]he government first provided . . . discovery regarding [an]
FBI DNA report" to his trial counsel "on or about February 26, 2015 . . . ." (ECF No. 1 at 4.)
According to Mr. Jenks, "[t]he FBI report informed trial counsel that the analyst examined only
five of the 19 condoms collected in October, 2014." (ECF No. 1 at 4.) Mr. Jenks alleges that one
of those five condoms was not tested for DNA evidence because the FBI's expert believed "that
no DNA evidence would be able to be collected from it." (*See* ECF No. 1 at 4.) Of the remaining
four condoms that were "examined," Mr. Jenks alleges the following:

> Petitioner's DNA was not found on one of the tested condoms, although his
> [step-] daughter's DNA was found on that condom. On two other condoms,
> Petitioner could not be excluded as being a minor contributor with his daughter
> being the major contributor. On one of these condoms, the statistical significance
> on which the government's expert could not exclude Petitioner was extremely
> weak. On the fourth condom, the government expert testified that to a
> "reasonable degree of scientific certainty" Petitioner's DNA was located on one
> side of the condom and his [step-] daughter's was located on the other side.

(ECF No. 1 at 4–5.) According to Mr. Jenks, his trial counsel "never asked" "their own" "DNA
expert" to conduct independent testing of any of the condoms." (ECF No. 1 at 6.)

On July 29, 2015, the assigned prosecutor to the case sent an email to Mr. Jenks' trial
counsel seeking "to broach the subject of a settlement." (ECF No. 1-7 at 2.) The email mentioned
a previously suggested "possibility of a 10 year deal" and the possibility of "obtain[ing] approval
to offer something closer to 8 years." (ECF No. 1-7 at 2.) But the email did not specify to which

counts Mr. Jenks would have to plead guilty. Nor did the prosecutor refer to the email itself as an "offer." (*See* ECF No. 1-7 at 2.)

On September 17, 2015, Mr. Jenks filed a Sealed Motion to Admit Evidence of Alleged Victim's Prior Sexual History pursuant to Rule 412 of the Federal Rules of Evidence. (2:15-cr-72, ECF No. 68.)

On December 21, 2015, a hearing was held on Mr. Jenks' Motion—among other motions. (*See* 2:15-cr-72, ECF No. 99.) At this hearing, Mr. Jenks' trial counsel proffered evidence of the victim's alleged sexual activity with five other men. (*See* 2:15-cr-72, ECF No. 96 at 3.)  The Government had interviewed these men about their sexual history with the victim. (*See* ECF No. 1 at 7 ("Instead, even though trial counsel obtained the names of others who had possibly engaged in sexual relations with the alleged victim, counsel failed to interview the potential witnesses, but nevertheless provided the names to the government, *which then conducted further investigation of these potential witnesses*.") (emphasis added).)

On December 22, 2015, the court denied Mr. Jenks' Motion. The court found that "[t]hese interviews establish[ed] that only four of" the men "admitted to being actually sexually active" with the victim. (*See* 2:15-cr-72, ECF No. 96 at 3.) "Of these four, one of them stated that" he and the Victim "began having sex after the allegations in the indictment ended." (*See* 2:15-cr-72, ECF No. 96 at 3.) The other three individuals stated that they had had sexual intercourse with the Victim during the period of time alleged in the indictment, but "most of these instances of sexual conduct occurred at these individual's homes, making any evidence from these encounters unlikely to be found in the woodpile on Mr. Jenks' property." (*See* 2:15-cr-72, ECF No. 96 at 3.) Additionally, "all three men stated that they did not use condoms when they had sex with" the Victim. (*See* 2:15-cr-72, ECF No. 96 at 3.) For these reasons, the court

found that the Victim's "activity with these individuals could not account for the physical evidence recovered from the woodpile . . . ." (*See* 2:15-cr-72, ECF No. 96 at 4.)

According to Mr. Jenks, "[t]he government then obtained DNA samples from" the men they had interviewed, "and compared them to the results obtained from the four condoms." (*See* ECF No. 1 at 7 n. 2.) On December 30, 2015, a FBI Laboratory Report was completed. (ECF No. 1-6 at 2.) This report appears to have concluded that the other men's DNA was not found on any of the four condoms the Government had previously tested. (*See* ECF No. 1-6 at 3 (The named individuals "are excluded as potential contributors of the DNA obtained from items 3(1), 5(2), 7(1), 7(2), and 10(1).").)

A jury trial was held in January of 2016. (*See* 2:15-cr-72, ECF No. 116.) At this trial, the Victim testified in detail about Mr. Jenks' repeated sexual abuse of her which was corroborated by DNA testing. Mr. Jenks was convicted on Counts 1, 3, and 4 of the Indictment. (ECF No. 1 at 2.) "Sentencing was held on June 17, 2016, and judgment was entered on June 24, 2016." (ECF No. 1 at 1.)

On February 11, 2019, Mr. Jenks filed a Motion to Vacate and Set Aside Conviction and Sentence Under 28 U.S.C. Section 2255. (ECF No. 1.) In this Motion, Mr. Jenks alleges that his trial counsel was ineffective for four reasons.

First, he argues that "trial counsel failed to provide petitioner with effective assistance of counsel as guaranteed by the sixth amendment by not investigating the physical evidence." (ECF No. 1 at 3.) Second, he argues that "trial counsel provided ineffective assistance during the plea negotiation stage of the proceedings." (ECF No. 1 at 9). Third, he argues that "trial counsel denied petitioner his right to the effective assistance of counsel by introducing evidence against their own client." (ECF No. 1 at 13). Fourth, he argues that "trial counsel provided ineffective

4

assistance by having petitioner sign a lengthy stipulation regarding the admission of physical evidence." (ECF No. 1 at 16).

On April 3, 2019, the Government filed an Opposition to Mr. Jenks' Motion. (ECF No. 9.) On August 19, 2019, Mr. Jenks filed a reply. (ECF No. 18 at 1.)

<u>Legal Standard</u>

Under 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct the sentence on the ground that the sentence was imposed in violation of the Constitution. *See* 28 U.S.C. § 2255(a). "Because the Sixth Amendment provides criminal defendants with the right to *effective* assistance of counsel . . . inadequate representation is a basis for relief under section 2255." *Morales v. United States*, 635 F.3d 39, 43 (2d Cir. 2011) (emphasis in original) (citations omitted).

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). "With respect to a claim that counsel's ineffective assistance led to the rejection of a plea offer that, properly informed, would have been accepted, a petitioner seeking a hearing must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, the petitioner would have accepted the plea offer." *Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009). "[C]onclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing," *United States v. Hershberger*, 940 F.2d 671 (10th Cir. 1991) (internal quotation marks omitted) (citations omitted).

Analysis

As discussed above, all four of Mr. Jenks' grounds for relief are for ineffective assistance of counsel. (*See* ECF No. 1 at 3; 9; 13; & 16.) Mr. Jenks "'faces a heavy burden' to establish ineffective assistance of counsel pursuant to section 2255." *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (citation omitted). To succeed on his "ineffective assistance of counsel claim under § 2255," Mr. Jenks "has the twofold burden of establishing that (1) defense counsel's performance was deficient, *i.e.,* counsel's 'representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms,' and (2) defendant was prejudiced thereby, *i.e.,* 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 694 (1984)). "Courts are free to address these two prongs in any order, and failure under either is dispositive." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (citation omitted).

Mr. Jenks was represented by an attorney when he submitted his Section 2255 petition. (*See* ECF No. 1 at 1; 18.) He was also represented by counsel when he submitted his reply. (*See* ECF No. 18 at 1; 19.) Because Mr. Jenks is represented by counsel, this court does not construe his pleadings liberally, as it would be required to do if he were pro se. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

The court addresses Mr. Jenks' arguments in turn.

I.    Mr. Jenks Is Not Entitled to a Hearing on His First Ground For Relief

Mr. Jenks argues that "[t]rial counsel provided ineffective assistance of counsel by failing to properly investigate the DNA evidence in a timely manner and by failing to properly analyze the government's DNA results." (ECF No. 1 at 3–4.) Mr. Jenks argues that "[t]he result of" his

trial counsel's "failure to investigate prejudiced" him for at least three distinct reasons. (*See* ECF No. 1 at 9). First, he argues that if he had "been advised in a timely manner of the strength of the evidence against him," he "would have settled the case by accepting one of the government's plea offers." (ECF No. 1 at 9). Second, he argues that "had trial counsel tested the remaining 14 condoms, there is a reasonable probability the court would have admitted the evidence pursuant to rule 412 which may well have resulted in a different outcome at trial." (ECF No. 1 at 9). Third, he argues that "no reasonable trial counsel would have called his own expert merely to tell the jury that he agreed with the government's witness in every regard, thus bolstering the prosecution's case." (ECF No. 1 at 9).

Thus, in his first ground for relief, Mr. Jenks argues that his trial counsel's failure to investigate prejudiced him both before trial and during trial. Mr. Jenks argues that, absent these errors, he would have accepted a plea offer and not gone to trial. And he also argues that there is a reasonable probability that the outcome of the trial would have been different absent these alleged errors. The court addresses (A) his arguments related to the outcome of his trial and then (B) his argument that he would have pled guilty if his counsel had discovered further evidence of his guilt.

A. Mr. Jenks Cannot Show a Reasonable Probability that, Absent His Trial Counsel's Alleged Errors, the Jury Would Have Had a Reasonable Doubt Respecting His Guilt

"[T]o show that the outcome of his trial was prejudiced by counsel's" alleged errors, Mr. Jenks "must show that those 'errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Hanson v. Sherrod*, 797 F.3d 810, 826 (10th Cir. 2015) (quoting *Strickland*, 466 U.S. at 687)). "To establish prejudice, he must demonstrate 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is "a probability

sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. As discussed

above, Mr. Jenks argues that his trial counsel erred by (1) failing to test the remaining 14

condoms and (2) calling the defense expert.

1. Trial Counsel's Decision to Not Test the Fourteen Remaining Condoms Did Not Prejudice Mr. Jenks At Trial

Mr. Jenks argues that if his "trial counsel tested the remaining 14 condoms, there is a

reasonable probability the court would have admitted the evidence pursuant to rule 412 which

may well have resulted in a different outcome at trial." (ECF No. 1 at 9). Here, Mr. Jenks'

argument involves two steps. First, he must show a reasonable probability that the court's ruling

on his Rule 412 Motion would have been different but for his trial counsel's alleged errors. If he

can meet his burden at this step, he must then demonstrate a reasonable probability that, absent

the errors, the jury would have had a reasonable doubt respecting his guilt. As explained below,

his argument fails at the first step. But even if he were able to reach the second step, his

argument would still fail because no reasonable jury would have had any reasonable doubt

respecting his guilt because the evidence of his guilt was overwhelming.

As discussed above, Mr. Jenks' counsel filed a Motion pursuant to Rule 412 "to establish

that someone other than the defendant was the source of the physical evidence in this matter . . .

." (2:15-cr-72, ECF No. 68 at 1.) In this court's order denying Mr. Jenk's Rule 412 Motion, the

court noted that it "may admit evidence of *'specific instances* of a victim's sexual behavior, if

offered to prove that someone other than the defendant was the source of semen, injury, or other

physical evidence.'" (2:15-cr-72, ECF No. 96 a 2 (quoting Fed. R. Evid. 412(b)(1)(A) (emphasis

in original)). The court denied Mr. Jenks' Motions for two alternative reasons. (*See* 2:15-cr-72,

ECF No. 96 at 3.) The first was that Mr. Jenks' trial counsel had failed to point to specific

instances of the Victim's conduct.[1] The second reason the court denied Mr. Jenks' Rule 412

motion was that "the evidence offered at the hearing," the "interviews with five men alleged to

have been sexual partners of" the Victim "would not [have] be[en] probative of the source of the

physical evidence in" the case. (ECF No. 96 at 3.) This is because of the three men who admitted

to having had sex with the Victim during the relevant period, none stated that they used condoms

when they had sex with her.

As this court held in 2015, the Victim's "activity with these individuals could not account

for the physical evidence recovered from the woodpile." (2:15-cr-72, ECF No. 96 at 6.) In his

2255 Motion, Mr. Jenks fails to provide any argument demonstrating a reasonable probability

that, but for his counsel's alleged errors, he would have been able to show specific instances of

the Victim's sexual behavior that would have satisfied Rule 412(b)(1)(A). He therefore fails at

the first step.

But even if he could meet his burden of establishing that his Rule 412 Motion would have

been granted, Mr. Jenks cannot show a reasonable probability that, absent his counsel's alleged

errors, "the factfinder would have had a reasonable doubt respecting guilt." *Hanson*, 797 F.3d at

826 (citation omitted). As this court previously noted, "[t]he Victim testified in specific detail at

trial about Mr. Jenks' repeated sexual abuse of her which was corroborated by . . . DNA testing."

(ECF No. 13 at 7). The court rejects any argument that Mr. Jenks prejudiced at trial by his

counsel's failure to test the remaining 14 condoms. As the court previously reasoned, even if

additional testing resulted in DNA of other men being found on the condoms, this "would not

have proven that Mr. Jenks did not commit the crime for which he was convicted." (ECF No. 13

---

[1] (*See* 2:15-cr-72, ECF No. 96 at 3 ("Mr. Jenks does not seek to offer specific instances of prior sexual conduct. Rather, he asks the court to admit evidence that D.J. had prior sexual activity with other men. The failure to identify specific instances of conduct precludes application of the other physical evidence exception to Rule 412(b)(1)(A).").

at 7). Again, even if this outcome were fully developed, "the court has no reason to believe that the result of the trial would have been different." (ECF No. 13 at 7). The same reasoning applies if "additional testing could have resulted in no additional DNA matches." (ECF No. 13 at 7).

For these reasons, the court holds that Mr. Jenks cannot demonstrate that his trial counsel's failure to test the fourteen untested condoms prejudiced him at trial.

2. Mr. Jenks Cannot Demonstrate that His Trial Counsel's Decision to Call the Defense's Expert Witness Sufficiently Prejudiced Him

Mr. Jenks argues that "no reasonable trial counsel would have called his own expert merely to tell the jury that he agreed with the government's witness in every regard, thus bolstering the prosecution's case." (ECF No. 1 at 9.) Here, Mr. Jenks argues that "[t]he defense expert testified on direct that he agreed with all the results of the FBI report," "thereby supporting the government's case against" Mr. Jenks. (ECF No. 1 at 6–7.)

"In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Id*. At 112. Mr. Jenks makes no argument that, absent his counsel's errors regarding the defense expert, the outcome of his trial would have been different. Mr. Jenks cannot demonstrate that his trial counsel's alleged error related to the defense expert prejudiced him at trial.

B.  Mr. Jenks' Trial Counsel's Decision Not to Test the Additional Fourteen Condoms Was
    Reasonable Because that Testing Would Have Likely Been Harmful to His Defense

Here, Mr. Jenks argues that "testing of the other condoms might have uncovered additional evidence against" him, "which would have facilitated case settlement." (ECF No. 1 at 8.) He further argues that "as a result of the counsel's failure to investigate the DNA evidence in the case, the attorneys had no basis on which to encourage Petitioner to settle the case." (ECF No. 1 at 8.)

In *Lafler v. Cooper*, 566 U.S. 156 (2012), the Supreme Court "clarified that the Sixth Amendment right to effective assistance of counsel extends specifically 'to the negotiation and consideration of plea offers that lapse or are rejected.'" *Osley v. United States*, 751 F.3d 1214, 1221 (11th Cir. 2014). In reaching its holding, the Supreme Court in *Lafler* confirmed that the two-part *Strickland* test applies to ineffective assistance claims based on rejected plea offers. *See Lafler*, 566 U.S. at 162–63. But the Court did not need to examine the deficient performance part of the *Strickland* test because it was undisputed that the Section 2254 petitioner's trial counsel's advice to reject a plea offer was deficient. *See Lafler*, 566 U.S. at 163 ("In this case all parties agree the performance of respondent's counsel was deficient when he advised respondent to reject the plea offer on the grounds he could not be convicted at trial. In light of this concession, it is unnecessary for this Court to explore the issue.").

Unlike in *Lafler*, the parties here do not agree on the deficient performance prong of the *Strickland* test. The Government argues that Mr. Jenks' trial counsel's decision not to test the condoms was "objectively reasonable under the circumstances." (ECF No. 9 at 7.)

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. This court's scrutiny of counsel's performance is highly deferential. This court "must indulge

11

a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance . . . ." *Strickland*, 466 U.S. at 689. Relevant here, "choices made after less

than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation." *Id*. at 691. One factor "affecting whether it

is reasonable not to investigate" is "whether counsel has 'reason to believe that pursuing certain

investigations would be fruitless or even harmful . . . .'" *Coleman v. Thaler*, 716 F.3d 895, 903

(5th Cir. 2013).

      Applying a strong presumption that Mr. Jenks' trial counsel's conduct falls within the

wide range of reasonable professional assistance, the court holds that Mr. Jenks' trial counsel's

decision not to conduct testing on the fourteen remaining condoms was reasonable. Mr. Jenks

himself acknowledges the possibility that additional test may have resulted in further evidence of

his guilt. (*See* ECF No. 1 at 8 ("the testing of other condoms might have uncovered additional

evidence against Petitioner . . . ."). Mr. Jenks cannot meet his burden of demonstrating that his

counsel's performance was deficient because his counsel had good reason to believe that further

testing would have been harmful to Mr. Jenks' defense. S*ee Harrington v. Richter*, 562 U.S. 86,

108 (2011) ("An attorney need not pursue an investigation that would be fruitless, much less one

that might be harmful to the defense.").

      To summarize, files, records, and briefing on Mr. Jenks' Section 2255 Motion

conclusively show that his trial counsel's decision not to test the fourteen condoms did not

prejudice him at trial. And they conclusively show that his trial counsel's decision to not test the

condoms was a reasonable decision. Thus, Mr. Jenks is not entitled to a hearing on these issues.

II.    <u>Mr. Jenks Is Not Entitled to a Hearing on His Second Ground For Relief</u>

Mr. Jenks argues that he "was denied his Sixth Amendment right to the effective assistance of counsel when his trial counsel did not properly advise him of the consequences of rejecting the plea offers from the government and as the result of this improper advice, [he] rejected the plea offers and proceeded to trial." (ECF No. 1 at 9–10.) Mr. Jenks alleges that the Government made at least three different plea offers to him in 2015. (*See* ECF No. 1 at 10–11.)

First, he alleges that "[h]is attorneys told him in May, 2015 that the government had offered a plea to a fifteen year sentence." (ECF No. 1 at 10.) But Mr. Jenks does not allege any specific details about this purported plea offer. He does not state to which count he would have pled guilty. Nor does he allege whether the offer would have required the plea be pursuant to Rule 11(c)(1)(c) of the Federal Rules of Criminal Procedure.

Second, he alleges that "[i]n June, 2015, his attorneys informed him that the prosecution had reduced their offer to a ten-year deal." (ECF No. 1 at 10.) He further alleges that "[h]is attorneys did not discuss the specific charges or applicable sentencing guidelines with him at that time . . . ." (ECF No. 1 at 10.)

Third, he alleges that "[i]n September, 2015, his attorneys informed him that the prosecution made an eight year offer to settle the case." (ECF No. 1 at 11.) Here, he relies on a July 29, 2015 email sent from the assigned prosecutor to his defense counsel. (*See* ECF No. 1 at 11.) That email provides, in relevant part:

> Rudy and Abby,
>
> Could you tell me whether you think there is any chance of this trial going forward on 9/28? It's going to require a lot of time and attention in order for me to be prepared to try it on that date.
>
> Also, I would like to broach the subject of a settlement. If I recall correctly, I previously mentioned to Abby the possibility of a 10-year deal. Having re-

13

evaluated the case, I believe I could probably obtain approval to offer something
closer to 8 years. Let's discuss at your leisure.

J. Drew Yeates
Assistant U.S. Attorney
District of Utah

(ECF No. 1-7 at 2.)

In response to Mr. Jenks' second ground of ineffective assistance, the Government argues
that "[t]he premise of Jenks' argument is flawed" because "[t]he United States never extended a
plea offer to [him]." (ECF No. 9 at 7.) Rather, the Government argues that "the parties discussed
the mere prospect of a possible plea offer." (ECF No. 9 at 7–8.)

In reply, Mr. Jenks argues that the court "should reject" the Government's arguments "at
this stage of the proceedings." Mr. Jenks argues that "there is no absolute requirement that a
formal plea offer be made during the negotiation stage for a defendant to prove ineffective
assistance of counsel during the plea stage." (ECF No. 1 at 8–9.)

As discussed above, in *Lafler*, the Supreme Court "clarified that the Sixth Amendment
right to effective assistance of counsel extends specifically 'to the negotiation and consideration
of plea **offers** that lapse or are rejected.'" *Osley v. United States*, 751 F.3d 1214, 1221 (11th Cir.
2014) (bold added). "If a plea bargain has been **offered**, a defendant has the right to effective
assistance of counsel in considering whether to accept it." *Lafler*, 566 U.S. at 168 (bold added).
But if "no plea offer is made," any ineffective assistance claim based on the Sixth Amendment
right established by *Lafler* "simply [cannot] not arise." *See Lafler*, 566 U.S. at 168. This is
because criminal defendants have "no right to be offered a plea . . . nor a federal right that the
judge accept it." *Missouri v. Frye*, 566 U.S. 134, 148 (2012).

If the Government did not make Mr. Jenks a plea offer, his second ground for relief
necessarily fails. The question for this court is whether Mr. Jenks has presented credible

evidence that the Government did in fact offer him a plea deal. If he has not, he is not entitled to

a hearing on this issue. *See Levy v. United States*, No. 11 CR. 62 (PAC), 2017 WL 1383762, at

*3 (S.D.N.Y. Apr. 13, 2017).[2] Resolution of this question first requires this court to determine

what types of prosecutor communications are sufficient to constitute an "offer" of a plea

agreement under *Lafler*.

      The parties point to no binding authority that defines the types of prosecutor

communications that are sufficient to constitute an "offer" of a plea agreement under *Lafler*. But

the Supreme Court has provided that "[a]lthough the analogy may not hold in all respects, plea

bargains are essentially contracts." *Puckett v. United States*, 556 U.S. 129, 137 (2009). "In order

for a contractual offer to exist, it must contain sufficiently definite terms to enable a fact finder to

interpret and apply them." *Mavashev v. United States*, No. 11-CV-3724 DLI, 2015 WL 1508313,

at *10 (E.D.N.Y. Mar. 31, 2015).

      This case does not require the court to determine each and every term a prosecutor

communication must contain to constitute a plea offer under *Lafler*. It is enough for this court to

hold that the prosecutor's July 2015 email in this case was not a plea offer under *Lafler* because

it lacked an essential term—to which charge would Mr. Jenks acknowledge guilt? Absent this

term, "no plea offer [was] made." *Lafler*, 566 U.S. at 168. If no plea offer was made, Mr. Jenks'

second ground for ineffective assistance of counsel fails.

---

[2] "To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a
plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim. In the context
of a rejected plea offer, the defendant must proffer arguably credible evidence of a *prima facie* case that, but for
counsel's improper advice, the petitioner would have accepted the plea offer." (citations omitted) (internal quotation
marks omitted).

Mr. Jenks argues that he has presented enough evidence to at least warrant a hearing to determine whether the Government made him a plea offer. (*See* ECF No. 18 at 8 ("the full nature of the plea negotiations between defense and government counsel should be fully developed at an evidentiary hearing." (ECF No. 18 at 8.) In support of his argument, Mr. Jenks relies on an opinion from 2013 that the undersigned authored. (*See* ECF No. 18 at 9 ("In *Polatis*, the precise nature of the offer was fully developed at an evidentiary hearing, the very hearing both parties acknowledge should be held in this case.").) The 2013 case Mr. Jenks relies on is *United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *3 (D. Utah Mar. 19, 2013). As explained below, unlike Mr. Jenks, the criminal defendant in *Polatis* demonstrated that a hearing was warranted.

In *Polatis*, this court granted a criminal defendant's "Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the Defendant Due to Ineffective Assistance of Counsel." *United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *12 (D. Utah Mar. 19, 2013). In his motion to compel, the criminal defendant in *Polatis* requested an evidentiary hearing. (*See* 2:10-cr-364, ECF No. 324.) And in his motion to compel, the criminal defendant alleged specific, non-conclusory facts that the Government had in fact made him a plea offer. (*See* 2:10-cr-364, ECF No. 311 at 3–5.) Importantly, the criminal defendant alleged two critical terms of the offer—which counts he would plead guilty to and the range of possible punishment for pleading guilty to those counts. (*See* 2:10-cr-364, ECF No. 311 at 4–5 ("On December 8, 2012, Mr. Leigh received another email from the United States amending the offer in the form of an email to require a plea to two murder-for-hire counts instead of one . . . Mr. Polatis states he was aware the sentencing range for the offer was 151-188 months, and that it would require him to plead to two of the murder-for-hire counts.").

16

After receiving the criminal defendant's motion that included specific, non-conclusory allegations of a plea offer, this court held an evidentiary hearing. (*See* 2:10-cr-364, ECF No. 326). At that evidentiary hearing, the email of the prosecutor's offer was introduced as an exhibit. (*See* 2:10-cr-364, ECF No. 327-1.) The plea offer provided, in relevant part:

> At the present time, we are looking to supersede tomorrow.... That guideline range is 324–405 months, criminal history category I.
>
> I would be willing to go to the screening committee with an agreement whereby *Mr. Polatis would plead guilty to only one count of murder-for-hire and we would agree that the judge would sentence him somewhere in the 151–188 month range.* (We both could argue for whatever sentence within that range we want the judge to give.) ...
>
> While I realize this is a significant sentence which will be difficult for Mr. Polatis to accept, I believe that if he were to go to trial, we would prevail and he could well be facing a life sentence, depending on how the issue of multiple counts is handled. And if he were to plead, he would receive credit for time served in this case and could receive 54 days off his sentence each year for good time.
>
> As I mentioned, if Mr. Polatis is amenable, I would be willing to present this *offer* to our screening committee. I need to let you know that the screening committee will have the final say on the deal-I do not have that authority.

*United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *1–2 (D. Utah Mar. 19, 2013) (emphases added). The prosecutor in that case later amended the offer. *See id.* at *3 ("On December 8, 2010, Ms. Travis sent a follow-up email explaining that she had made a mistake in her email the previous day because Defendant would need to plead to two counts of murder-for-hire and not one."). After defense counsel filed a motion to dismiss, the prosecutor in that case sent an email to defense counsel stating that because the defendant's "intentions have been to litigate this case with the United States rather than negotiate . . . the [Government's] **offer** is hereby withdrawn." *United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *3 (D. Utah Mar. 19, 2013).

17

Mr. Jenks argues that "the Government's brief implying that no offers were made is not evidence." (ECF No. 18 at 8.) Mr. Jenks is correct that on a Section 2255 petition, a "district court cannot simply credit the government's [factual assertions] and discredit the defendant's." *See United States v. Hershberger*, 940 F.2d 671 (10th Cir. 1991). But it is also true that "[c]onclusory allegations unsupported by specifics are insufficient to require a court to grant an evidentiary hearing, as are contentions that in the face of the record are wholly incredible . . . ." *Hopkinson v. Shillinger*, 866 F.2d 1185, 1211 (10th Cir. 1989) (overruled on other grounds as stated in *Phillips v. Ferguson*, 182 F.3d 769, 772-73 (10th Cir. 1999)).

The criminal defendant in *Polatis* was entitled to a hearing because he sufficiently and specifically alleged the existence of a plea offer containing essential terms—which counts he would plead guilty to and the range of punishment for having pled guilty. Further, the court was able to infer from his allegation that the plea offer was pursuant to Rule 11(c)(1)(c) of the Federal Rules of Criminal Procedure because he alleged that the "sentencing range for the offer was 151-188 months." (2:10-cr-364, ECF No. 311 at 5.)

Here, unlike in *Polatis*, Mr. Jenks has not specifically alleged a plea offer containing an essential term—to which count or counts he would plead guilty. As discussed above, Mr. Jenks has alleged three separate plea offers. His allegations do not warrant holding a hearing.

His allegation that "[h]is attorneys told him in May, 2015 that the government had offered a plea to a fifteen year sentence" (ECF No. 1 at 10) is conclusory and insufficient to require this court to grant an evidentiary hearing to determine whether a plea offer was actually made. Mr. Jenks does not identify which of his attorneys told him this information. Nor does Mr. Jenks identify which prosecutor communicated this offer to his attorneys. Moreover, Mr. Jenks does not allege any specific details about this purported plea offer. He does not state to which

18

count the Government would have required him to plead guilty. Nor does he allege whether the

offer would have required that the plea be pursuant to Rule 11(c)(1)(c) of the Federal Rules of

Criminal Procedure.

Mr. Jenks' allegation that "[i]n June of 2015, his attorneys informed him that the

prosecution had reduced their offer to a ten-year deal" (ECF No. 1 at 10) is also insufficient to

require this court to grant him a hearing. Mr. Jenks' allegation is supported somewhat by the

email that he attached to his motion. (*See* ECF No. 1-7 at 2.) In that email the assigned

prosecutor referenced a previous "possibility of a 10 year deal." (ECF No. 1-7 at 2.) But again,

Mr. Jenks includes no details about the specifics of the alleged plea offer. He does not state to

which count the Government would have required him to plead guilty. Nor does he allege

whether the offer would have required that the plea be pursuant to Rule 11(c)(1)(c) of the Federal

Rules of Criminal Procedure. Mr. Jenks' allegation that there was a plea offer is conclusory.

The email that Mr. Jenks attached to his motion is also not sufficient evidence for this

court to hold a hearing. As discussed above, the email supports the Government's representation

that "[t]he United States never extended a plea offer to Jenks" (ECF No. 9 at 7) because the

email lacks an essential term. Further, the prosecutor here, in his July 2015 email, never

described his communication as an "offer." (*See* ECF No. 1-7 at 2.) This is in stark contrast to

the prosecutor in *Polatis*, who, in her email to defense counsel in that case, described her

communication as an offer. *See Polatis*, 2013 WL 1149842 at *2 ("As I mentioned, if Mr. Polatis

is amenable, I would be willing to present this **offer** to our screening committee.") (bold added);

*see id*. at *3 ("After Defendant's arraignment hearing on December 20, 2010 Ms. Travis sent Mr.

Leigh an email referring to the motions to dismiss as evidence that Defendant's 'intentions have

been to litigate this case with the United States rather than negotiate. As such, the **offer** is hereby

withdrawn.'"). One of the court's concerns in *Polatis* that ultimately weighed in favor of granting the defendant's motion was that a prosecutor's use of the term "plea offer," "to [a] layperson and non-specialist lawyer alike, would appear to refer to an offer that a Defendant can accept and rely on." *Polatis*, 2013 WL 1149842 at *10. That concern is not present here because Mr. Jenks has not pointed to any email communication from the Government making any "offer" to him. Instead, the email simply references the possibility of obtaining approval "to offer something." (ECF No. 1-7.) Thus, unlike in *Polatis*, the prosecutor here did not consider his email an offer.

To summarize, in order for Mr. Jenks to prevail on his second ground for relief, he must show that the Government offered him a plea deal. Mr. Jenks' allegations that the Government did offer him a plea deal are conclusory. Conclusory allegations of a plea offer are insufficient to warrant a hearing on his second ground for relief.

III.    <u>Mr. Jenks Is Not Entitled to a Hearing on His Third Ground for Relief</u>

Mr. Jenks argues that "[t]rial counsel provided ineffective assistance of counsel by erroneously introducing inflammatory and prejudicial evidence against their own client by permitting their own witness to testify that Petitioner was incarcerated for over a year and to deny the existence of the alleged victim's exculpatory journals, and by calling in the defense case-in-chief the government hair expert, whose testimony undercut Petitioner's defense." (ECF No. 1 at 13–14.) "In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "Instead, *Strickland* asks whether it is 'reasonably likely' the

20

result would have been different." *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Id*. At 112.

Mr. Jenks argues that "there is a reasonable probability of a different result" absent his counsel's alleged errors. (ECF No. 18 at 15.) Based on the overwhelming evidence of his guilt, this court holds that Mr. Jenks cannot meet his burden of demonstrating a substantial likelihood that the result of his trial would have been different. His third ground for relief fails.

IV.    <u>Mr. Jenks Is Not Entitled to a Hearing on His Fourth Ground For Relief</u>

Mr. Jenks argues that "trial counsel provided ineffective assistance by having petitioner sign a lengthy stipulation regarding the admission of physical evidence." (ECF No. 1 at 16.) In response, the Government argues that "Jenks failed to establish that his counsel's performance was deficient" and "also failed to establish how his counsel's advice to sign the stipulations 'reasonably likely' affected the result of the trial." (ECF No. 9 at 10.) The court agrees that Mr. Jenks cannot show that he was prejudiced because he cannot show a substantial likelihood that the result of his trial would have been different.

<u>Conclusion</u>

For the foregoing reasons, Mr. Jenks' Motion to Vacate and Set Aside Convictions and Sentence Under 28 U.S.C. § 2255 is DENIED.

Dated this 22nd day of January, 2020.

BY THE COURT:

CLARK WADDOUPS
United States District Judge

ATTACHMENT 3

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RICHARD JENKS, JR. <br><br> Petitioner, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR CERTIFICATE OF APPEALABILITY** <br><br><br> Case No. 2:19-cv-94 <br><br> Judge Clark Waddoups |

Before the court is Mr. Jenks' Motion for Certificate of Appealability. (ECF No. 21.) As explained below, the court DENIES the motion.

<u>Background</u>[1]

On January 22, 2020, the court denied Mr. Jenks' Motion to Vacate and Set Aside Convictions and Sentence. Relevant here, the court held that "trial counsel's decision not to test the fourteen remaining condoms did not prejudice Mr. Jenks at trial" (ECF No. 19 at 8) because he could not show a reasonable probability that, "absent his counsel's alleged errors, the factfinder would have had a reasonable doubt respecting his guilt.'" (ECF No. 19 at 9 (quoting

---

[1] Much of the background of this case is detailed in two of the court's previous orders, (ECF Nos. 13 & 19.)

*Hanson v. Sherrod*, 797 F.3d 810, 826 (10th Cir. 2015).) The court also held that because Mr. Jenks' allegations "that the Government [had] offer[ed] him a plea deal [were] conclusory," his second ground for relief for ineffective assistance failed and he was not entitled to a hearing on that issue. (*See* ECF No. 19 at 20.)

On February 5, 2020, Mr. Jenks filed his Motion for Certificate of Appealability for his first two claims. (*See* ECF No. 21 at 1–2.) In his first claim, he alleged that his trial counsel "failed to provide [him] with effective assistance of counsel as guaranteed by the Sixth Amendment by Not Investigating the Physical Evidence." (ECF No. 21 at 2.) In his second claim, he alleged that his trial counsel "provided ineffective assistance during the plea negotiation stage of the proceedings." (ECF No. 21 at 2.)

<u>Analysis</u>

To obtain a certificate of appealability, Mr. Jenks "must make a 'substantial showing of the denial of a constitutional right.'" *United States v. Martinez*, No. 19-2173, 2020 WL 864722, at *2 (10th Cir. Feb. 21, 2020) (quoting 28 U.S.C. § 2253(c)(2)). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The *petitioner must demonstrate* that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added).

In denying Mr. Jenks' Motion to Vacate and Set Aside his Convictions and Sentence, the court explained why all four grounds of his ineffective of assistance claims failed. Apart from two paragraphs of purely conclusory argument, Mr. Jenks does not explain why the court's order was debatable or wrong. Mr. Jenks has not demonstrated that reasonable jurists would find this

court's assessment of his constitutional claims debatable or wrong. He is not entitled to a certificate of appealability.

Order

For the foregoing reasons, Mr. Jenks' Motion for Certificate of Appealability is DENIED.

Dated this 26th day of February, 2020.

BY THE COURT:

_____
CLARK WADDOUPS
United States District Judge

ATTACHMENT 4

# United States v. Polatis

United States District Court for the District of Utah, Central Division

March 19, 2013, Decided; March 19, 2013, Filed

Case No. 2:10-cr-0364

## Reporter

2013 U.S. Dist. LEXIS 39064 *; 2013 WL 1149842

UNITED STATES OF AMERICA, Plaintiff, v. KELLY J. POLATIS, Defendant.

**Prior History:** United States v. Polatis, 885 F. Supp. 2d 1166, 2012 U.S. Dist. LEXIS 111431 (D. Utah, 2012)

**Counsel:** [*1] For Kelly J. Polatis, Defendant: Edwin S. Wall, SALT LAKE CITY, UT.

For USA, Plaintiff: Veda M. Travis, LEAD ATTORNEY, Richard D. McKelvie, US ATTORNEY'S OFFICE (UT), SALT LAKE CITY, UT.

**Judges:** Clark Waddoups, United States District Judge.

**Opinion by:** Clark Waddoups

## Opinion

### MEMORANDUM DECISION AND ORDER COMPELLING REOFFER OF PLEA AGREEMENT

The court heard evidence at a hearing on December 7, 2012 relating to Defendant's Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the Defendant Due to Ineffective Assistance of Counsel [Dkt. No. 310]. After briefing on the issues following the evidentiary hearing, the court heard oral argument on the motion on March 1, 2013. The court has carefully considered the parties' arguments at the hearing and in their briefs and finds that Defendant has been deprived of his Sixth Amendment right to effective assistance counsel in negotiating and

deciding whether to accept the Government's plea agreement.

## I. BACKGROUND

### Indictment and Plea Offer

On May 5, 2010, Defendant was indicted for two counts of murder-for-hire. On December 8, 2010, a grand jury returned a seventeen-count Superseding Indictment charging Defendant with thirteen counts of murder-for-hire [*2] and four counts of tampering with a witness. [Dkt. No. 86.] After trial, the jury convicted Defendant on ten counts of murder-for-hire and on all four counts of witness tampering. (Jury Verd. [Dkt. No. 247].) [1]

When Defendant was originally indicted, his trial counsel Lawrence Leigh [2] advised him verbally about his "bottom line" potential sentence under the sentencing guidelines, which he communicated as 20 to 24 years. On November 24, 2010, Mr. Leigh sent the lead prosecutor on the case, Ms. Veda Travis, an email with the subject line "Polatis Plea Offer" requesting that Ms. Travis let him know "what the government will offer to settle this case before trial." (Email of Nov. 24, 2010, Ev. Hrg.

---

[1] The court granted Defendant's renewed Motion for Judgment of Acquittal [Dkt. Nos. 238 and 271] after the verdict as to Count VIII of the Superseding Indictment, thus dismissing one of the ten murder-for-hire counts for which Defendant had been convicted. (*See* Mem. Dec. & Order dated Aug. 3, 2012, at 13-14 [Dkt. No. 305].)

[2] Mr. Leigh is an attorney in private practice who was appointed by the court to represent Defendant and who had substantial experience both prosecuting and defending criminal defendants, though never in a potential life sentence case, which this case become upon the return of the Superseding Indictment on December 8, 2010.

United States v. Polatis

Def.'s Ex. A.) Ms. Travis is an experienced Assistant United States Attorney who has been with the U.S. Attorney's Office since 1999 working in the violent crime section for [*3] all but one year in which she was assigned to narcotics. Mr. Leigh followed up with Ms. Travis on December 6, 2010 whereupon she responded on December 7, 2010 with an offer of 151-188 months for a plea to one count of murder-for-hire. The plea offer read in relevant part as follows:

> At the present time, we are looking to supersede tomorrow. . . . That guideline range is 324-405 months, criminal history category I.
>
> I would be willing to go to the screening committee with an agreement whereby Mr. Polatis would plead guilty to only one count of murder-for-hire and we would agree that the judge would sentence him somewhere in the 151-188 month range. (We both could argue for whatever sentence within that range we want the judge to give.) . . .
>
> While I realize this is a significant sentence which will be difficult for Mr. Polatis to accept, I believe that if he were to go to trial, we would prevail and he could well be facing a life sentence, depending on how the issue of multiple counts is handled. And if he were to plead, he would receive credit for time served in this case and could receive 54 days off his sentence each year for good time.
>
> As I mentioned, if Mr. Polatis is amenable, I would [*4] be willing to present this offer to our screening committee. I need to let you know that the screening committee will have the final say on the deal—I do not have that authority.

(Email of Dec. 7, 2010, Ev. Hrg. Def.'s Ex. A.)

At oral argument the Government argued, and Ms. Travis's colleague Carlos Esqueda in the U.S. Attorney's Office testified, that the plea offer was made under the framework of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure (a key element of which is that Defendant would waive his right to appeal). Ms. Travis and Mr. Esqueda, who was a member of the Screening Committee that would ultimately have to sign off on the plea offer if Defendant accepted it, discussed the terms of the plea offer before Ms. Travis communicated it to Mr. Leigh. Mr. Esqueda testified that he told Ms. Travis that the offer was "worthy of presenting to the Screening [*5] Committee" as long as the mechanisms of Rule 11(c)(1)(C) were in place. (Tr. Ev. Hrg. Dec. 7, 2012, at 151 [Dkt. No. 328].) Ms. Travis testified that as a general matter she would not go to the Screening Committee with an offer that the committee would reject and that if Defendant had accepted the plea offer, she would have drafted a memorandum for the Screening Committee presenting the offer for final approval. She testified that if Defendant had accepted the plea offer from her email of December 7, 2010 (modified as described below on December 8), she would in fact have been willing to present that plea to the Screening Committee. Mr. Esqueda testified that although he discussed the offer with Ms. Travis before she sent it to Mr. Leigh, and although he personally viewed it as a "significant sentence," he thought there was a possibility that the broader Screening Committee might find the range too low. (*Id.* at 150, 152.)

## Treatment of Plea Offers in the U.S. Attorney's Office

Mr. Esqueda explained at the evidentiary hearing, and the Government argued at oral argument, that if a plea offer of the kind Ms. Travis made to Mr. Leigh were accepted by a defendant, the offer would still not [*6] be binding on the Government at that time because it would then have to be approved by the

United States v. Polatis

Screening Committee. In fact, Mr. Esqueda testified that "[w]hat an AUSA does in its negotiations with the defense attorney is not an offer." (*Id.* at 148.) The word "offer" is a "common term" in this context, [3] Mr. Esqueda conceded, but he explained that "we [the U.S. Attorney's Office] use the term offer to mean something that is set in stone or during the negotiations of a case." (*Id.* at 149.) "An offer is only authorized after it has been screened or as it exists today as it has been approved by their section chief." (*Id.* at 148.) According to Mr. Esqueda, Assistant U.S. Attorneys should make a "reasonableness evaluation" before they submit any proposal for the resolution of the case to the Screening Committee (as Ms. Travis testified was her general practice) but in his experience "that is not always done" because "there are times where AUSAs do send plea memos to the screening committee with no expectation of them being granted" simply because defense counsel requested it. (*Id.* at 149-150.) But Mr. Esqueda's recollection was that Ms. Travis's offer in this case was not the kind of offer [*7] that she considered unreasonable and merely wanted to present to the Screening Committee upon defense counsel's request (and Ms. Travis implied that she would not do that on principle).

When asked whether he ever became aware that Defendant had rejected the plea offer, Mr. Esqueda went so far as to testify that "[t]here was never a plea offer to reject." (*Id.* at 153.) When asked to confirm whether it was his testimony that "there was no plea offer to reject," Mr. Esqueda testified "I'm saying that there is no *formal* plea offer to reject." (*Id.* at 154 (emphasis added).) But after the Screening Committee approves of an offer that a

defendant has indicated is acceptable, Mr. Esqueda explained, then "the offer is formally made to defense counsel" and if "the defendant says I accept, then the government is bound by that agreement." (*Id.* at 149.)

## Superseding Indictment and Discussion of the Plea Offer

On the same day he received Ms. Travis's email communicating the plea [*8] offer, Mr. Leigh drafted and sent a letter to Defendant enclosing Ms. Travis's email and stating

> Enclosed is the government's offer in the form of an email today from Veda Travis. I will respond by indicating that we will consider it, and then I will talk to you further. As this offer seems to be along the lines of the kind of offer we thought we would get, I think we already have discussed the pros and cons of accepting an offer like this. At any rate, here it is in black and white. This may make your decision a relatively simple one.

(Letter of Dec. 7, 2010, Ev. Hrg. Def.'s Ex. B.) Mr. Leigh never confirmed with Defendant whether he received the letter but assumed he had. Defendant testified that he never received it.

On December 8, 2010, Ms. Travis sent a follow-up email explaining that she had made a mistake in her email the previous day because Defendant would need to plead to two counts of murder-for-hire and not one. (Email of Dec. 8, 2010, Ev. Hrg. Def.'s Ex. C.) She testified that this was necessary in order to accommodate a sentence of 151-188 months. The follow-up email did not include a disclaimer similar to the one in the initial email ("I need to let you know that the screening [*9] committee will have the final say on the deal—I do not have that authority."). Mr. Leigh responded by email to say "No problem, I have not been able to discuss this with him yet." (Email of Dec. 8,

---

[3]

Mr. Esqueda went on to explain that "the term offer could mean one of two things, a formal plea offer, or the beginnings or the ongoing negotiations of a particular case." (Tr. Ev. Hrg. Dec. 7, 2012, at 154 [Dkt. No. 328].)

2010, Ev. Hrg. Pl.'s Ex. 7.) As promised, later that day, the Government obtained the Superseding Indictment [Dkt. No. 86] from the grand jury. On December 15, 2010, Defendant filed two motions to dismiss. [Dkt. Nos. 90, 91.] After Defendant's arraignment hearing on December 20, 2010 Ms. Travis sent Mr. Leigh an email referring to the motions to dismiss as evidence that Defendant's "intentions have been to litigate this case with the United States rather than negotiate. As such, the offer is hereby withdrawn." (Email of Dec. 20, 2010, Ev. Hrg. Pl.'s Ex. 8.)

Between December 8 and December 15, 2010, Mr. Leigh visited Defendant in the adult detention center and discussed the Superseding Indictment and the plea offer. Mr. Leigh told Defendant that the offer was 151 to 188 months for two counts of murder-for-hire. Mr. Leigh does not remember telling Defendant that the defense would be able to argue for the low end of that range and the Government could argue for the high end. But Mr. Leigh remembers [*10] telling Defendant that it would be a harder decision about whether to accept or reject the plea offer if the government "had offered something like five years on an obstruction of justice count." (Tr. Ev. Hrg. Dec. 7, 2012, at 14 [Dkt. No. 328].) Mr. Leigh did not tell Defendant not to take the offer but he told Defendant that in his opinion the case was triable. Mr. Leigh also testified confidently that he did not then or at any time thereafter discuss with Defendant the sentencing guidelines relating to the Superseding Indictment, which Ms. Travis had mentioned in her email of December 7, 2010 (referring to "324 to 405 months, criminal history category I"), and that he continued under the assumption that Defendant had read Mr. Leigh's letter and the attached plea offer email.

**Ineffective Assistance of Counsel**

Instead of discussing with Defendant the sentencing guidelines applicable under the Superseding Indictment (324 to 405 months) or that Defendant would be able to argue for the low end of the plea offer range of 151 to 188 months if he chose to accept the plea, Mr. Leigh discussed why he thought the case was triable. Specifically, Mr. Leigh said that the Government would have to [*11] prove both an intent to kill and a substantial step, neither of which he thought the Government could show under the facts. Mr. Leigh would present an intoxication defense at trial, obviating Defendant's specific intent. He also told Defendant that based on having reviewed a pattern jury instruction on murder-for-hire, he believed that murder-for-hire would require "a bargain for exchange and exchange of consideration of contractual terms." (*Id.* at 26.) And so Mr. Leigh discussed with Defendant "the fact that the government didn't get what they bargained for here. They didn't get any money up front." (*Id.* at 27.)

Even after the trial and jury verdict in July 2011 convicting Defendant of ten counts of murder-for-hire and on all four counts of witness tampering, Mr. Leigh did not immediately assess the applicable sentencing guidelines. Defendant eventually asked Mr. Leigh about them and Mr. Leigh realized he would need to review them to be able to discuss them accurately with Defendant. By October, after work on post-trial motions was largely out of the way, Mr. Leigh finally looked into the sentencing guidelines and discovered he had likely never calculated them based on the guidelines [*12] applicable to the charges in the Superseding Indictment. Mr. Leigh testified that "to this day" he does not know why he did not perform the calculations "but I didn't do it." (*Id.* at 16.) Mr. Leigh further testified that upon performing the calculation he realized "it could be worst case scenario he could be facing a life

sentence which made it even all the worse if this was a mistake that yeah I had made." (*Id.* at 19.)

Defendant testified that when Mr. Leigh discussed the Government's plea offer with him between December 8 and December 20, 2010, he did not understand what his risk exposure was under the sentencing guidelines applicable to the charges in the Superseding Indictment. Defendant further testified that before receiving the plea offer Mr. Leigh had told him that he "had an extremely good chance of winning this case" and so he hoped the Government did not offer Defendant just an obstruction of justice charge with a five year sentence because that would make it a tough decision as to whether to plead. (*Id.* at 72.) Defendant related that when Mr. Leigh discussed the plea offer with Defendant, he said "you don't have to worry about a tough decision . . . because it is 150 something [*13] [months] to 180 something [months]." (*Id.*) According to Defendant, it was not until after trial and after Mr. Leigh had worked through post-trial motions that Defendant learned from Mr. Leigh that he was facing a prison term of his natural life under the applicable sentencing guidelines. Ultimately, Defendant testified that if he had known at the time of the plea offer that he faced life in prison under the sentencing guidelines relating to the charges in the Superseding Indictment and that he could be convicted even though he had not paid any money to the undercover agent posing as a hit man, he would have accepted the plea offer of 151 to 188 months, with the opportunity to argue for the low end, in exchange for pleading guilty to two murder-for-hire charges.

## III. ANALYSIS

The discussions and interactions in the period of December 7, 2010 to December 20, 2010 between Defendant and his trial counsel about the Government's plea offer, together with trial counsel's approach at trial, amounted to ineffective assistance of counsel relating to the offered plea agreement. As a result, the court must compel the Government to reoffer the plea agreement to remedy the Constitutional defect.

## A. [*14] Right to Effective Assistance of Counsel in Plea Bargaining

The Sixth Amendment guarantees Defendant the right "to have the assistance of counsel for his defence." U.S. Const. amend. VI. "The right to counsel is the right to effective assistance of counsel." *Missouri v. Frye*, 132 S. Ct. 1399, 1404, 182 L. Ed. 2d 379 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). [4] In *Frye*, the Supreme Court affirmed that a criminal defendant's right to effective assistance of counsel extends to the plea bargaining process. 132 S. Ct. at 1404 (finding that the defendant was deprived of effective assistance of counsel required by the Constitution when trial counsel allowed a plea offer "to expire without advising the defendant or allowing him to consider it"). "In today's criminal justice system," the *Frye* Court observed, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Id.* at 1407. Continuing, the Court reasoned that "[t]he potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties. In [*15] order that these benefits can be realized, however, criminal defendants require effective

---

4

"In giving meaning to the requirement, however, we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686.

United States v. Polatis

counsel during plea negotiations. Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him." *Id.* at 1407-08 (internal quotation marks and citations omitted).

The Supreme Court also simultaneously held in *Lafler v. Cooper* that assistance of counsel was constitutionally ineffective when a defendant's trial counsel advised him "to reject the plea offer on the grounds he could not be convicted at trial" based on counsel's reliance on "an incorrect legal rule." 132 S. Ct. 1376, 1383-1384, 182 L. Ed. 2d 398 (2012) (explaining that the defendant had rejected plea offers "allegedly after his attorney convinced him that the prosecution would be unable to establish his intent [*16] to murder . . . because [the victim] had been shot below the waist"). The *Lafler* Court emphasized that "the two part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 1384 (quoting *Hill v. Lockhart*, 474 U. S. 52, 58, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985)). "The performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). [5] "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). In *Hill*, the defendant pleaded guilty based on defective counsel from his attorney. *Hill*, 474 U.S. at 59. In *Lafler*, as here, the defendant rejected plea offers based on deficient performance of

counsel and faced significantly more jail time based on the convictions at trial. *Lafler*, 132 S. Ct. at 1385 ("Having to stand trial, not choosing to waive it, is the prejudice alleged.").

## B. Constitutionally Deficient Performance

As noted above, "[t]he performance prong of *Strickland* requires a defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). The *Strickland* Court clarified that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. In analyzing trial counsel's performance in this case, the court acknowledges that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. [6] And the "proper measure of attorney performance," as referred to in *Strickland*, is not precisely defined outside of the requirement to comply with "prevailing professional norms." At a minimum, however, it is obvious [*18] that "it is objectively

---

[5]

 In *Lafler* all parties agreed that the defendant's trial counsel's performance "was [*17] deficient when he advised respondent to reject the plea offer on the grounds he could not be convicted at trial" and the Supreme Court therefore did not analyze this prong of the *Strickland* test. *Id.* at 1384.

---

[6]

 The court is mindful that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal [*19] trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." *Strickland*, 466 U.S. at 690; *accord Johnson v. United States*, 860 F. Supp. 2d 663, 780 (N.D. Iowa 2012) (citing *Premo v. Moore*, __ U.S. __, 131 S. Ct. 733, 742, 178 L. Ed. 2d 649 (2011) for the proposition that caution is necessary in "reviewing the performance of counsel at the pretrial stage of the proceedings, when neither the prosecution nor the defense may know with much certainty what course the case may take").

unreasonable for defense counsel advising the defendant on a plea offer to grossly underestimate the defendant's sentencing exposure in the event of a guilty verdict at trial." *Ortega v. United States*, No. 02-cr-348-LTS-GWG, 2012 U.S. Dist. LEXIS 88727, at *35 (S.D.N.Y. June 27, 2012) (internal quotation marks and citations omitted). In advising a defendant in the plea bargaining process, "counsel *must communicate to the defendant the terms of the plea offer*, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." 2012 U.S. Dist. LEXIS 88727, at *32 (quoting *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (emphasis added)). The court agrees that communication of all of the terms of the plea offer should be a bare minimum for the "objective standard of reasonableness" governing defense counsel's representation during the plea bargaining process. [7]

In this case, Mr. Leigh did not "grossly underestimate the defendant's sentencing exposure in the event of a guilty verdict [*20] at trial." 2012 U.S. Dist. LEXIS 88727, at *35. Rather, Mr. Leigh testified that when presenting the plea offer to Defendant he did not also discuss the sentencing exposure he faced under the Superseding Indictment and, in fact, never even calculated the sentencing guidelines applicable to those charges until long after Defendant was convicted at trial. In *Ortega*, the court ultimately found that counsel's advice in the plea negotiation, "even if not ideal in its presentation, was sufficient to allow [the defendant] *to compare the likely sentencing exposure he faced if he went to trial*

*compared with the likely sentencing exposure he faced if he pled without an agreement.*" 2012 U.S. Dist. LEXIS 88727, at *38 (emphasis added). Here, the court must evaluate the Defendant's inability to make such a comparison (between the sentencing range in the plea offer and the sentencing range arising from the sentencing guidelines applicable to the Superseding Indictment) based on counsel's performance in dealing with the plea offer.

### 1. Knowledge of Comparative Sentence Exposure

The Tenth Circuit has recently examined the issue of constitutionally defective performance of counsel at the plea bargaining stage in *United States v. Washington*, 619 F.3d 1252 (10th Cir. 2010). [*21] [8] In assessing whether the defendant had suffered from ineffective assistance of counsel in the sentencing process, the *Washington* court addressed the implications of defense counsel's failure to understand, communicate, or effectively advise on the exposure a defendant faces under the sentencing guidelines at the plea bargaining stage for comparison. In doing so, the Tenth Circuit articulated a helpful measurement for counsel's performance at the plea bargaining stage: "[k]nowledge of the comparative sentence exposure between standing trial and

---

[7]

This is, of course, consistent with *Frye*'s holding that counsel's performance is constitutionally defective where a plea offer is allowed to expire without defendant knowing about it or considering it.

---

[8]

In *Washington*, the defendant appealed claiming ineffective assistance of counsel at both the plea bargaining stage and the sentencing stage. He alleged that his trial counsel had advised him not to accept a plea offer of a ten-year sentence and that he was convicted at trial and then sentenced to a total of 120 [*22] years. 619 F.3d at 1254-55. As to the allegations of ineffective assistance of counsel at the plea bargaining stage, the Tenth Circuit held that "[e]ven assuming that defense counsel's performance was deficient, however, the district court's factual finding that the government never made a firm plea offer finds adequate support in the record. Thus, Mr. Washington cannot make the requisite *Strickland* showing that but for [trial counsel's] ineffective assistance, he would have plead guilty." 619 F.3d at 1256-57. In other words, regardless of the deficiency of trial counsel's *performance*, defendant could not satisfy the second prong of the *Strickland* test—the showing of resulting *prejudice*.

United States v. Polatis

accepting a plea offer will often be crucial to the decision whether to plead guilty." *Id.* at 1259-60 (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)). This measure for counsel's performance at the plea bargaining stage—ensuring that the defendant has this comparative knowledge—is particularly instructive in this case. [9]

Moreover, two state cases informed this measure of performance as articulated in *Day* and specifically emphasized by the Tenth Circuit in *Washington*; both of these cases illustrate the "prevailing professional norms," *Strickland*, 466 U.S. at 688, with which counsel must comply at this stage of the process. As cited in *Day*, 969 F.2d at 43, the [*23] Maryland Court of Appeals found a constitutionally deficient performance of counsel at the plea bargaining stage where counsel failed to advise the defendant of the mandatory 25-year to life sentence he faced under the applicable guidelines when presented with an offer to plead guilty to a lesser offense for a sentence of 10 years. *Williams v. State*, 326 Md. 367, 605 A.2d 103, 111 (Md. 1992) (overturning the appellate court and remanding to the trial court so that defendant could accept the plea offer or, if defendant decided not to accept the reoffered plea agreement, to reinstate the original conviction).

Similarly, as cited in *Day*, the Pennsylvania Superior Court found that trial counsel's performance had been deficient in not advising defendant that a plea offer for a three-year maximum sentence was attractive where the risk exposure was ten to forty years if convicted at a trial in which the chances of acquittal were slim. *Commonwealth v. Napper*, 254 Pa. Super. 54, 385 A.2d 521, 524 (Pa. Super. 1978)

(reversing the trial court's denial of defendant's post-conviction petition alleging ineffective assistance of counsel). The *Napper* court observed that "[d]efense counsel has a duty to communicate to his client, [*24] not only the terms of a plea bargain offer, but also the relative merits of the offer *compared to the defendant's chances at trial.*" *Id.* (emphasis added). Quoting the 1967 edition of Amsterdam, Segal and Miller's *Trial Manual for the Defense of Criminal Cases*, the *Napper* court further explained that the decision about accepting or rejecting a plea offer is so crucial that "a considerable amount of persuasion" might be necessary "*to convince the client to plead guilty in a case where a not guilty plea would be totally destructive.*" *Id.* (emphasis as supplied by *Napper* court). The court does not believe that the professional standard to which counsel must adhere in advising defendants at the plea or plea bargaining stage has lessened in intervening years.

To the contrary, the District Court for the Eastern District of Tennessee recently confirmed that such a standard continues to apply at the plea bargaining stage in *United States v. Wolfe*, No. 2:11-cr-33-JRG, 2012 U.S. Dist. LEXIS 75369 (E.D. Tenn. May 31, 2012). In *Wolfe*, before the return of a superseding indictment, [10] the Government "extended a proposed plea agreement" to the defendant in which he would plead guilty to one drug charge [*25] and one possession of firearm charge and the Government would dismiss the remaining three counts. 2012 U.S. Dist. LEXIS 75369, at *23. The defendant argued ineffective assistance of counsel because he was never told "how federal sentences are determined" and,

---

[9]

Although decided before *Frye* and *Lafler*, *Washington*'s analysis is grounded in *Hill* and *Strickland*, and the Tenth Circuit adopted this particular measure from *Day*.

---

[10] In [*26] the superseding indictment, one charge was changed to refer to use of an AK-47 assault rifle in furtherance of a drug trafficking offense, which carried the enhanced penalty of "a ten year mandatory minimum to a maximum of life imprisonment to run consecutively to the underlying drug offense." 2012 U.S. Dist. LEXIS 75369, at *3.

United States v. Polatis

more importantly for the present case, was not advised "of the Sentencing Guidelines range which would apply to his case." 2012 U.S. Dist. LEXIS 75369, at *24. Although his counsel "did tell him that Count Five carried a mandatory minimum," defendant testified that his counsel "never told him about the potential difference in penalties if he accepted the plea agreement." 2012 U.S. Dist. LEXIS 75369, at *24-25. [11] Citing *Lafler, Strickland* and other leading cases, the *Wolfe* court explained that "[i]n a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time." 2012 U.S. Dist. LEXIS 75369, at *30 (quoting *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003)). On this basis, the *Wolfe* court found that counsel's representation of the defendant in the plea negotiations was "constitutionally deficient." 2012 U.S. Dist. LEXIS 75369, at *33.

A comparative view of sentencing exposure is also missing in this [*27] case. Although Mr. Leigh discussed the "bottom line" of 151-188 months from the Government's plea offer with Defendant, the record shows that he did not calculate or discuss with Defendant his actual sentencing exposure under the Superseding Indictment. Mr. Leigh regretfully testified that "this is a puzzle to me even to this day as to why I didn't do it, but I didn't do it." (Tr. Ev. Hrg. Dec. 7, 2012, at 16 [Dkt. No. 328].) [12] And yet the applicable sentencing exposure under the Superseding Indictment was more than twice what Defendant faced under the plea offer. Mr. Leigh's performance in his representation during this plea negotiation therefore deprived Defendant of any "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer," which was "crucial to [his] decision whether to plead guilty." *Washington* at 1259-60. The representation was constitutionally deficient, as in *Wolfe*, because by failing to discuss the applicable sentencing guidelines under the Superseding Indictment, Defendant's counsel essentially "never told him about the potential difference in penalties if he accepted the plea agreement." 2012 U.S. Dist. LEXIS 75369 at *24-*25. [*28] As in *Williams* and *Napper*, Defendant could not assess "the relative merits of the offer compared to [his] chances at trial." *Napper*, 385 A.2d at 524.

It is true that Mr. Leigh promptly forwarded the Government's plea offer email to Defendant in a letter that he instructed his staff to send to Defendant in the detention center and assumed from that point onward, without ever verifying, that Defendant received it. But Defendant claims he never received the letter and, although the court is aware that, as the Government points out, this testimony is self-serving and uncorroborated, the court finds that even if Defendant had received the letter, he

---

[1] Defense counsel testified that he reviewed the applicable sentencing guidelines with defendant (though "he could not recall how the range was calculated or what the range was," 2012 U.S. Dist. LEXIS 75369, at *27) at the detention center after the prosecutor, just prior to the return of the superseding indictment, had made an oral offer to him that was the same as the proposed (written) plea agreement but which dropped the requirement to cooperate and the assault rifle charge. 2012 U.S. Dist. LEXIS 75369, at *25-26 & n.16. He claimed that he recommended that the defendant accept the offer but the defendant rejected it. 2012 U.S. Dist. LEXIS 75369, at *26. But the court noted that "the testimony of counsel conflicts dramatically with that of defendant and his mother" and ultimately found that "the testimony of defendant and his mother far more credible than that of [defense counsel]." 2012 U.S. Dist. LEXIS 75369, at *31.

---

[2] Mr. Leigh is a respected and experienced attorney in the community. By this caveat, the court wishes to express that a constitutional deficiency in performance of representation is not limited to the types of genuinely bad lawyers on display in some of the cited decisions. Unfortunately, it can occasionally occur where counsel is dedicated and normally conscientious in all aspects of his or her representations, as is the case here.

would have still needed guidance from Mr. Leigh in understanding it. "If a plea bargain has been offered, a defendant [*29] has the right to effective assistance of counsel in considering whether to accept it." *Lafler*, 132 S. Ct. at 1387. Effective assistance of counsel in considering it would have entailed, in this case, discussion with counsel of the applicable guidelines under the Superseding Indictment and their comparative implications. It is not enough for a defendant to merely read about the terms of an offer on his own; that is not effective assistance of counsel.

Additionally, Mr. Leigh did not even convey all of the terms of the plea offer to Defendant when he informed him of the offered sentencing range. Specifically, he did not explain that part of the plea offer was that Defendant would be able to argue for the low end of the offered range. The court finds this to be a material term. As a result, because at the very least "counsel must communicate to the defendant the terms of the plea offer" in advising during a plea negotiation, *Ortega*, 2012 U.S. Dist. LEXIS 88727, at *32, Mr. Leigh's performance in this instance fell short of the "objective standard of reasonableness" required by *Strickland.*

### 2. Incorrect Legal Principle

Defendant draws an explicit comparison between Mr. Leigh's apparently mistaken [*30] opinion about the Government's burden at trial, which he expressed to Defendant in relating his opinion that the case was triable, [13]

---

[1]

[3] Mr. Leigh told Defendant that the Government would have to prove that consideration was given in order to convict him for murder-for-hire. Mr. Leigh explained to Defendant that he thought the Government would not be able to meet this burden [*31] because of "the fact that the government didn't get what they bargained for here. They didn't get any money up front." (Tr. Ev. Hrg. Dec. 7, 2012, at 27 [Dkt. No. 328].) The court addressed Defendant's counsel's view about this in the context of ruling on Defendant's Renewed Motion for Acquittal after the jury returned its verdict, finding that although the law on this

and the facts in *Lafler.* (Def.'s Mem. Supp. Mot. Compel 28 [Dkt. No. 332].) That is, in *Lafler* counsel advised the defendant to reject plea offers based on counsel's incorrect view that "the prosecution would be unable to establish [the defendant's] intent to murder . . . because [the victim] had been shot below the waist." *Lafler*, 132 S. Ct. 1383. But because the court has already found Mr. Leigh's representation of Defendant in the plea negotiation process to be constitutionally defective based on his failure to convey all of the material terms of the plea offer to Defendant and to ensure that Defendant had an understanding of the comparative sentence exposure between standing trial and accepting the plea offer, the court need not address Defendant's further arguments about Mr. Leigh's ineffective representation.

### C. *Strickland* **Prejudice**

*Strickland*'s "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Lafler*, 132 S. Ct. at 1384 (quoting *Hill*, 474 U. S. at 59). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious [*32] charges or the imposition of a more severe sentence." *Id.* at 1387. The *Lafler* Court explained that "[i]n these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea

---

principle is not firm in the Tenth Circuit, "it is clear that the evidence presented at trial was sufficient to allow a rational fact-finder to conclude, beyond a reasonable doubt, that such an agreement was made" in spite of money not actually changing hands. (*See* Mem. Dec. and Order dated Aug. 3, 2012, at 37 [Dkt. No. 305].)

United States v. Polatis

and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 1385.

At oral argument, the Government argued that Defendant was going "a bridge too far" [14] by investigating these outcomes; pursuing such queries, it argued, necessarily constituted "absolute speculation." But the Supreme Court in *Frye* and *Lafler* affirmed the necessity of entertaining speculation about the "reasonable probability" of these outcomes to apply the prejudice prong of the *Strickland* test in the context of determining whether Defendant was afforded effective assistance of counsel in the plea negotiation. [15] After all, the *Lafler* Court

---
[1]

[4]Using a passionate appeal to the World War II military action referred to as Operation Market Garden.

---
[1]

[5]Frustrated with the implications of entertaining such hypotheticals, the Government's position appears quite close to Justice Scalia's in writing for the dissent in *Frye*:

> Prejudice is to be determined, the Court tells us, by a process of retrospective crystal-ball gazing posing as legal analysis. First of all, of course, we must estimate whether the defendant *would have accepted* the earlier plea bargain. Here that seems an easy question, but as the Court [*34] acknowledges . . . it will not always be. Next, since Missouri, like other States, permits accepted plea offers to be withdrawn by the prosecution (a reality which alone should suffice, one would think, to demonstrate that Frye had no entitlement to the plea bargain), we must estimate whether the prosecution *would have withdrawn* the plea offer. And finally, we must estimate whether the trial court *would have approved* the plea agreement. These last two estimations may seem easy in the present case, since Frye committed a new infraction before the hearing at which the agreement would have been presented; but they assuredly will not be easy in the mine run of cases.

132 S. Ct. at 1413 (Scalia, J., dissenting) (emphasis in original); *accord Lafler*, 132 S. Ct. at 1394 (Scalia, J., dissenting). Regardless of the merits or perceived merits of the dissent's reasoning, the court must follow the majority and does so here by entertaining these hypotheticals, concluding that Defendant has sufficiently shown

identified [*33] "[h]aving to stand trial, not choosing to waive it" as "the prejudice alleged," 132 S. Ct. at 1385, clarifying further that the defendant "went to trial rather than accept a plea deal, and it is conceded this was the result of ineffective assistance during the plea negotiation process," *id.* at 1386. The Court observed that "the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Id.* Here, Defendant experienced both as a result of Mr. Leigh's constitutionally defective performance at the plea bargain stage.

The court is persuaded that the *Strickland* prejudice prong is satisfied in this case. Under the plea offer, Defendant would have plead guilty to two [*35] counts of murder-for-hire and faced a sentencing range of 151 to 188 months, with the ability to argue for the lower end of that range at sentencing. "Having to stand trial, not choosing to waive it," *Lafler*, 132 S. Ct. at 1385, because of ineffective assistance of counsel (as discussed above), Defendant was convicted on ten counts of murder-for-hire and four counts of witness tampering and, as a result, is now facing a guideline range of 325 to 405 months, more than double his sentencing exposure under the plea offer. Defendant testified to the court's satisfaction, and the court accordingly finds a reasonable probability, that he would have accepted the plea offer if the material terms had been presented to him and if he had benefitted from a correct understanding of the government's burden at trial and thus had a clearer picture of his chances of success at trial.

The Government argued in some detail about the perplexities within the U.S. Attorney's Office surrounding whether the plea offer Ms.

---

prejudice under *Strickland* on that basis.

United States v. Polatis

Travis made was a "firm offer" that could satisfy the remaining speculative queries discussed in *Lafler* and outlined above. The court notes the colloquial use of the term "plea offer" that,    [*36] to layperson and non-specialist lawyer alike, would appear to refer to an offer that a Defendant can accept and rely on. Complicating the issue, apparently in an attempt to clarify the U.S. Attorney's Office's in-house use of the term "offer," Mr. Esqueda testified that "we use the term offer to mean something that is set in stone or during the negotiations of a case." (Tr. Ev. Hrg. Dec. 7, 2012, at 149 [Dkt. No. 328].) In other words, when an Assistant U.S. Attorney uses the word "offer," in the view of the U.S. Attorney's Office, the Assistant U.S. Attorney is either referring to a "firm offer" that is "set in stone," meaning that it has been vetted and authorized by the Office's internal Screening Committee, or the Assistant U.S. Attorney is referring to a tentative "offer" used "during the negotiations of a case." Mr. Esqueda reiterated that "the term offer could mean one of two things, a formal plea offer, or the beginnings or the ongoing negotiations of a particular case." (*Id.* at 154.) Neither Mr. Esqueda nor Ms. Travis, in their testimony, delineated how a defendant, defense counsel, or the public at large would be able to tell the difference between the Assistant U.S. Attorney's    [*37] different uses of the word "offer" in a given instance.

The court need not wade into the complexity of the uses of "offer" or "firm offer" or the applicable contract principles that govern plea offers at this time because the proffered testimony allays any concerns it would have about whether the plea offer would have taken effect had the Defendant accepted it. [16] The

Supreme Court has held that "[i]n order to complete a showing of *Strickland* prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." *Frye*, 132 S. Ct. at 1410. It is true that Ms. Travis helpfully added in the plea offer email a disclaimer that she did not have final authority, and that the plea offer, should Defendant accept it, would be subject to review and final authorization by the Screening Committee. And the court agrees that from a contract perspective Ms. Travis's follow-up email of [*38] December 8, 2010 must be read in conjunction with the initial plea offer email and thus subject to the same disclaimer. But Defendant does not appear to have received that email and, in any event, Mr. Leigh did not discuss this with him. More importantly, however, Ms. Travis—one of the most senior and experienced Assistant U.S. Attorneys in the Office—testified that it is not her practice to propose a plea offer to defense counsel that she is not already confident the Screening Committee will accept. Moreover, she vetted the plea offer with Mr. Esqueda—one of the five members of the Screening Committee—who viewed the range presented

---

[16] [*39] Counsel can be constitutionally ineffective in the plea negotiation process if they fail to convey to the defendant the government's articulated willingness to resolve a case by negotiation or have proposed a resolution to the case." (Def.'s Mem. Supp. Mot. Compel 23 [Dkt. No. 332].) This reasoning is consistent with the language and implications of *Frye* and *Lafler*: "The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, 132 S. Ct. at 1407; *accord Lafler* at 1384.

---

1

[6] The court is also persuaded by Defendant's argument that "[i]t is submitted that even if a firm offer is not conveyed to defense counsel, when the government indicates it is willing to negotiate a resolution in a case, defense counsel has a duty to engage in the negotiation process.

United States v. Polatis

in it as a "substantial sentence" and the plea offer as a whole to be "worthy of presenting to the Screening Committee" as long as the mechanisms of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure were in place. (Tr. Ev. Hrg. Dec. 7, 2012, at 151 [Dkt. No. 328].)

Ms. Travis further testified that, with Mr. Esqueda's implicit sign-off (he testified that in the end he left it up to Ms. Travis to decide if she wanted to proceed with making the plea offer to defense counsel), she would have drafted a memorandum for the Screening Committee presenting the offer for final approval if Defendant had accepted the plea offer. The court acknowledges Mr. Esqueda's testimony that, although he personally viewed [*40] the sentence range as substantial and the plea offer as acceptable, he thought there was a chance that the Screening Committee as a whole might think the proposed sentencing range was too low. But Ms. Travis's testimony that she would not present a plea offer that she was not confident the Screening Committee would accept and would not draft a memorandum for submission to the Screening Committee (which she said she would have done in this case if Defendant had accepted the plea offer) if she did not think that a plea was acceptable convinces the court that there is at least a reasonable probability that the Government would have accepted its own plea offer to Defendant. [17]

The court also finds that it would have accepted

---

[1]

[7] The *Frye* Court explained that "[i]t can be assumed that in most jurisdictions prosecutors and judges are familiar with the boundaries of acceptable plea bargains and sentences. So in most instances it should not be difficult to make an objective assessment as to whether or not a particular fact or intervening circumstance would suffice, in the normal course, to cause prosecutorial withdrawal or judicial nonapproval of a plea bargain. The determination that there is or is not a reasonable probability that the outcome [*41] of the proceeding would have been different absent counsel's errors can be conducted within that framework." 132 S. Ct. at 1410.

the plea offer had it been presented to the court as having been accepted by both Defendant and the Government, particularly in light of the mechanics of Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, including, primarily, the Defendant's waiver of his right to appeal.

Although the Government might prefer that Justice Scalia's reasoning for the dissent in both *Frye* and *Lafler* had carried the day, the majority in both of those cases outlined an analysis of hypotheticals that this court must undertake. The outcome of that analysis, under the facts of this case, leads the court to find that defense counsel's constitutionally defective performance in the plea negotiations prejudiced Defendant under the *Strickland* standard.

## D. Remedy

Following the guidance in *Lafler*, once "a defendant shows ineffective assistance of counsel has caused the rejection of a plea leading to a trial and a more severe sentence," the court must address the question of "what constitutes an appropriate remedy." 132 S. Ct. at 1388. [*42] "Sixth Amendment remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. Thus, a remedy must neutralize the taint of a constitutional violation while at the same time not grant a windfall to the defendant or needlessly squander the considerable resources the State properly invested in the criminal prosecution." *Id.* at 1388-89 (internal quotation marks and citations omitted). For the circumstances in which ineffective assistance of counsel has led to a defendant's prejudicial rejection of a plea offer, as here, the *Lafler* court outlined the envisioned potential remedies:

The specific injury suffered by defendants

United States v. Polatis

who decline a plea offer as a result of ineffective assistance of counsel and then receive a greater sentence as a result of trial can come in at least one of two forms. In some cases, the sole advantage a defendant would have received under the plea is a lesser sentence. This is typically the case when the charges that would have been admitted as part of the plea bargain are the same as the charges the defendant was convicted of after trial. In this situation the court may conduct an  [*43] evidentiary hearing to determine whether the defendant has shown a reasonable probability that but for counsel's errors he would have accepted the plea. If the showing is made, the court may exercise discretion in determining whether the defendant should receive the term of imprisonment the government offered in the plea, the sentence he received at trial, or something in between.

In some situations it may be that resentencing alone will not be full redress for the constitutional injury. If, for example, an offer was for a guilty plea to a count or counts less serious than the ones for which a defendant was convicted after trial, or if a mandatory sentence confines a judge's sentencing discretion after trial, a resentencing based on the conviction at trial may not suffice. In these circumstances, the proper exercise of discretion to remedy the constitutional injury may be to require the prosecution to reoffer the plea proposal. Once this has occurred, the judge can then exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed.

*Id.* at 1389 (internal citation omitted). Basically, the goal of the remedy is to put  [*44] Defendant back in the position he would have been in if he had accepted the plea offer.

At oral argument, Defendant argued that both options are available to the court in this instance. The Government did not have a firm position on the question of remedies under *Lafler.*The court finds that under *Lafler* the first form of injury is not applicable in this case and therefore the first option is not available to the court. The second form of injury has occurred in this case because the Defendant, having rejected the plea offer based on trial counsel's constitutionally defective performance at the plea bargaining stage, was convicted at trial on charges more serious than those to which he would have plead in the plea offer, and applicable mandatory sentences apply to Defendant's post-conviction sentencing guidelines. Accordingly, the court finds that the "proper exercise of discretion to remedy the constitutional injury" in this situation is "to require the prosecution to reoffer the plea proposal." *Id.*[18]

The court is aware that this is an example of a case in which "the rejection of the plea offer result[ed] in a substantial expenditure of scarce prosecutorial or judicial resources" because of the complex jury trial and numerous post-trial motions, including this one, which this court has needed to address despite its limited resources and substantial caseload. *Lafler*, 132 S. Ct. at 1399 (Alito, J., dissenting). But constrained as it is to follow the majority's holding, it has and will endeavor to "do so in a way that mitigates its potential to produce unjust results." *Id.*

## CONCLUSION

---
1

[8] In surveying the potential remedies outlined in *Lafler*, the court acknowledges Justice Scalia's concern that the remedy of compelling the Government "to reoffer the plea agreement" is  [*45] "a remedy unheard-of in American jurisprudence—and, I would be willing to bet, in the jurisprudence of any other country." *Id.* at 1396 (Scalia, J., dissenting).

United States v. Polatis

Based on the foregoing, the court GRANTS Defendant's Motion to Compel the United States to Reoffer the Plea Agreement Previously Rejected by the Defendant Due to Ineffective Assistance of Counsel [Dkt. No. 310]. Accordingly, the court orders the Government to reoffer the proposed plea agreement dated December 7, 2010 (as modified on December 8, 2010). If Defendant accepts the plea offer, the convictions will be vacated and Defendant will appear for [*46] sentencing consistent with the plea offer.

SO ORDERED this 19th day of March, 2013.

BY THE COURT:

/s/ Clark Waddoups

Clark Waddoups

United States District Judge

---

**End of Document**